## THE PEOPLE v. EPHRIAM HARRIS.

*Criminal law—Homicide—Evidence—Disposition of deceased—Trial—Witness—Self-defense.*

1. It is competent for the respondent in a homicide case to testify to the general reputation of the deceased for quarrelsomeness, to the violence of his temper and conduct when in anger, and to give instances or specific acts of violence within the knowledge of the respondent or coming under his own observation.

2. An objection to the testimony of a witness because his name is not indorsed on the information comes too late after the witness has been sworn and examined at length.

3. Where, in a homicide case, the names of the father and mother of the respondent are indorsed on the information, and the mother, who claims to have witnessed the entire affray, is called and testifies on behalf of the people, the rights of the respondent are fully protected by the prosecution calling the father, who had not witnessed the beginning of the affray, and having him sworn, and by his examination by the counsel for the respondent.

Error to Sanilac. (Beach, J.) Argued February 1, 1893. Decided March 10, 1893.

Respondent was convicted of manslaughter, and sentenced to imprisonment in the State prison for six years. Judgment reversed. The facts are stated in the opinion.

*McGinley & Houck,* for respondent.

*A. A. Ellis,* Attorney General, and *E. C. Babcock,* Prosecuting Attorney, for the people.

McGRATH, J. Respondent was informed against for murder, and was tried, and convicted of manslaughter. The defense was justifiable or excusable homicide.

The parties lived upon adjoining farms, and the affray occurred in the highway, at about 9 o'clock in the morn-

ing. Deceased was 23 years of age, weighed 180 pounds, was nearly 6 feet in height, and was strong and muscular, while the accused was but 16 years of age. The killing was done with an ordinary pocketknife. Deceased had but recently commenced to build a house, evidently contemplating marriage. He had been for some time paying attention to a young lady in the neighborhood, who was a cousin of the accused. Evidently he had made little progress in his suit. Accused and his cousin were much attached to each other, and were frequently in each other's company. This intimacy appears to have displeased decedent, and he did not hesitate to express his displeasure to both. It was shown that he had said to the young lady, in effect, that their devotion to each other could not be attributed to their relationship. He had warned the accused to keep out of his way, and had threatened to break his neck if he did not; had angrily struck at him on one or more occasions; and had on one occasion, while accused was sitting beside his cousin, caught him by the foot in anger, and dragged him from his seat to the floor. A few days before the tragedy the father of the accused and decedent met; the building of the house was referred to, and in a joking manner Mr. Harris said to decedent, "Suppose that before you get your house built some one takes away your girl?" and decedent replied in an angry tone, "Well, there will be a dead man on this road." The accused does not appear to have resented any of these indignities, but rather feared and avoided the deceased. It was shown that on several occasions, when there was even a prospect of meeting decedent, the accused had requested others to accompany him on his errand or to his home. On the morning of the day of the tragedy the mother of the accused requested him to go to a neighbor's for some milk. He at first hesitated, giving as a reason that he feared meeting deceased, but, on being assured that

deceased was not about, he started upon his errand with tin pail in hand.

There were but three witnesses who claimed to have seen the affray. One, a brother of decedent, who was 18 rods distant, claimed that decedent did not attack the accused till after the latter had drawn his knife. The other two witnesses were the father and mother of the accused, who were also some distance from the scene. Their testimony tended to show that deceased was the aggressor. The accused testifies that after reaching the highway he observed deceased enter it; that he was on one side of the highway and deceased on the other; that the latter crossed the highway, and intercepted him, and began the attack violently, angrily, and with profanity; that the witness was thrown to the ground, but managed to regain his feet; that he retreated in a north-westerly direction to the fence, calling for help, and entreating deceased to let him alone, but deceased followed him, and threw him down the second time with great violence; and when deceased was stabbed he was in the act of choking the accused. Even upon the brother's testimony it does not appear that the accused struck or struck at the deceased until the latter had grappled with the former. Deceased had dropped his mittens, and a bag which he had upon his shoulder, in the highway, at some time during the affray, and there was testimony clearly tending to show that the place where the final struggle took place was some 20 feet north-westerly from where the mittens and bag lay. The brother's testimony was that when he first saw the parties the accused stood with his knife in one hand and the tin pail in the other, and that deceased was in the act of throwing down his mittens and the bag, after which he took hold of the accused; thus indicating that the accused stood upon the defensive, and that decedent made the attack, and forced the accused against the fence.

Upon the examination of the accused the defense sought to show not only the general reputation of the deceased for quarrelsomeness, but the violence of his temper and conduct when in anger, and the accused was asked to give instances or specific acts of violence within his knowledge or coming under his own observation, but the court excluded the testimony.

We think this was error. The killing having been established, two things must concur to justify or excuse the homicide:

1. The decedent must have been the aggressor, as a party cannot seek or invite or invoke a quarrel, and then be allowed to excuse or justify a killing in that affray.

2. The attack must be such as to create in the mind of the slayer a reasonable apprehension of danger to life or of great bodily harm.

The question as to who was the aggressor, and the other question as to whether the apparent danger to the accused was sufficient to justify the use of the knife, were both questions of fact for the jury. The testimony tending to show the *animus* or motive of the deceased was, in view of the conflict in the testimony upon that point, competent as bearing upon the question as to which was the assailant. *Holler v. State*, 37 Ind. 57; *Stokes v. People*, 53 N. Y. 164. Upon the other point, it was competent for the defense to show not only the relative strength of the parties and the visible evidences of danger, but also any facts calculated to affect the mind of the accused, or calculated to warrant his apprehension of danger. Suppose that the defense could have shown that the accused had been informed of the fact, or had had personal knowledge of the fact, that in another encounter the deceased had brutally kicked or bitten or choked or stamped upon his antagonist, can it be said that such knowledge or information would not have materially increased his apprehension

of danger? It must be borne in mind that the necessity for taking human life need not be one arising out of real or actual and imminent danger in order to excuse the slayer, but he may act upon a belief arising from appearances which give him reasonable cause to apprehend danger of great bodily harm, although there is no actual danger. His guilt must depend upon the circumstances as they appeared to him, and his mental condition must necessarily be materially affected by any knowledge he possessed of the physical strength or violent temper of the deceased, or his violence when in anger.

In *Hurd v. People*, 25 Mich. 405, 418, defendant offered to show by a witness that deceased was a man of high temper and quarrelsome disposition, and known by the defendant to be so at the time of the shooting, but the court excluded the testimony. The Court say:

" If the defendant, when threatened with immediate attack by an assailant, is authorized to act, and his actions are to be judged, from the circumstances as they appeared to him at the time, as held by this Court in *Pond v. People*, 8 Mich. 150, as admitted by the court in his charge (a principle of natural justice, which must never be overlooked in such cases), then it necessarily follows that the evidence offered was admissible; since the knowledge or belief of the prisoner that the person threatening him with an immediate personal attack is a man of high temper and quarrelsome disposition is a most important circumstance, from which he is to estimate the probability and the character of the attack, and what course of conduct he has reason to expect from the assailant, as well as the means which, at the moment, he may deem necessary to guard himself from the threatened danger."

The language of that case is equally applicable to this, for knowledge obtained from others or from personal observation of particular acts of violence would be as likely to affect the mind of the prisoner as general information that he might have obtained in common with the commu-

nity that deceased was a man of high temper. *Wilson v. People*, 94 Ill. 299; *People v. Lilly*, 38 Mich. 270.

Mr. Harris was one of the witnesses of the affray. His name was upon the information. He was called by the prosecution to testify upon the preliminary examination. Upon the trial he was called to the stand by the people, and sworn. The prosecuting attorney then announced, "No examination." The defendant's counsel insisted that, as the witness was an eye-witness to the affray, it was the duty of the prosecuting attorney to bring out his knowledge concerning it The prosecution had already called the mother of the accused, who claimed to have seen the entire affray. Mr. Harris, the father, had not witnessed the early part of the affray; and the rights of the defendant were fully protected by his examination by defendant's counsel.

A number of errors are assigned upon the court's refusal to give requests to charge and upon the instructions given. In addition to the instructions given, which are without error, the trial judge should have instructed the jury as to what testimony they should consider in determining the question as to which of the parties was the aggressor; that, if they believed that deceased was a quarrelsome person, or that he had made threats against defendant, or that he entertained any vindictive feeling against defendant, or had a motive for assailing the accused, those facts must be considered by them, in connection with the other testimony in the case, in determining the question as to who was the aggressor; and that if the accused did not begin or invite the affray, but stood in fear of the deceased, and upon the defensive, and deceased in an angry and violent manner attacked the accused, at the same time using violent, profane, and threatening language, and the accused, fearing an attack, took out his

pocketknife, and with it in his hand backed away from the deceased, endeavoring to avoid the conflict, at the same time telling his assailant to keep away from him, but the deceased did not heed the warning, but followed the accused, grappling with him, and the accused, acting upon the belief, arising from all the circumstances as they appeared to him,—the strength of his assailant, the violence of the attack, the threats which had been made by deceased, his information or knowledge as to the violence of his assailant's temper or his violence when in anger, and any other circumstances calculated to produce fear and apprehension of danger,—that he was in danger of his life or of great ·bodily harm, used the knife, then the defendant must be acquitted.

It is unnecessary to discuss the other assignments of error.

The objection to the testimony of the witness ·William Halifax because his name did not appear on the information came too late after the witness had been sworn and examined at length.

For the errors referred to, the judgment must be reversed, and a new trial awarded.

The other Justices concurred.