STATE v. H. C. WILLIAMS.

(Filed 9 December, 1914.)

1. **Evidence—Dying Declarations—Opinions—Collective Facts—Trials—Questions for Jury.**

    In cases of homicide, dying declarations of the deceased are frequently made under conditions rendering it impossible for the declarant to state the circumstances in connection with his death in detail, and making it necessary to receive his statement as evidence of a collective fact, in proper instances; and it is *Held,* that where the defendant and the deceased went together into the home of the defendant, where the deceased was killed with a pistol, and immediately after the shooting the deceased crawled from the house to the porch and fell to the ground and there made his dying statement that the defendant had shot him without cause, the statement is not objectionable as the opinion of the deceased, but competent as his statement of the fact, which at least should be submitted to the jury, under proper instructions when there is doubt whether the statement was the declarant's opinion or his statement of the fact.

2. **Appeal and Error—Instructions—Presumptions.**

    The presumption is in favor of the correctness of the charge given to the jury by the trial judge, when his charge is not sent up in the record.

3. **Appeal and Error—Objections and Exceptions—Unanswered and Leading Questions.**

    Where the defendant is on trial for homicide, and a witness has given his testimony, stated by him upon examination of the court to be all he knew of the circumstances connected with the case, his statement will be taken as conclusive, nothing else appearing; and it is further held that

the exceptions by defendant to the exclusion of unanswered questions in this case will not be held for reversible error, the questions being objectionable as leading and it not appearing what facts would have been elicited had they been answered.

**4. Homicide—Trials—Evidence—Corroboration—Testimony Before Coroner —Appeal and Error—Harmless Error.**

The defendant upon a trial for murder introduced the written testimony of his witness given before the coroner to corroborate his evidence given on the trial, some of which was not admitted by the trial judge, who held that the part excluded had not been testified to on the trial, and upon a comparison made in the Supreme Court on appeal, it is held no reversible error was committed, it appearing that, if erroneous, the excluded evidence was insufficient to furnish grounds for a new trial of the case.

**5. Homicide—Self-defense—General Character for Violence—Previous Declarations of Deceased.**

Upon the question of self-defense arising under the evidence on a trial for homicide, the general character of the deceased for violence is admissible in proper instances, and there is well considered authority that evidence of his acts of violence coming under the defendant's observation or of which he has been informed by the deceased is also competent; but where there is no evidence of this general character of the deceased for violence, or that the prisoner believed him to be a dangerous man, or stood in fear of him, and there is ample evidence to the contrary, the exclusion of the defendant's offered testimony that the deceased told him he had had a fight with a man in a hotel in Richmond, and had stabbed him twice, without further narration, or giving the time of its occurrence, will not be held for reversible error; and it is further held that the conduct of the deceased in stabbing the man, had it occurred, is not necessarily evidence of violence or of unlawful conduct.

**6. Homicide—Evidence—Dying Declarations—Impeachment.**

Where, upon a trial for murder, dying declarations of the deceased are admitted, they should be received as the testimony of any other witness, and their weight and credit are for the jury, and where they are sought to be impeached by the defendant's evidence, it is competent to corroborate the declarations by evidence of the good character of the deceased or by showing that he had made other similar statements.

**7. Homicide—Drunkenness—Evidence—Corroboration.**

When, on a trial for murder, testimony is competent which tends to show that the defendant was drinking at the time, evidence that he was playing, laughing, and scrambling in a store several hours before the homicide is competent as corroborative.

**8. Homicide—Trials—Argument to Jury—Extrinsic Matters—Appeal and Error.**

Where on a trial for homicide with a pistol the defendant has testified as to the place and relative positions of himself and the deceased, and expert witnesses introduced by the State have testified as to the range of the bullets and their effect, etc., it is not error for the trial judge not to permit the defendant's attorney, in addressing the jury, to demonstrate by any disinterested witness in the courtroom that the expert witnesses intro-

duced by the State corroborated the defendant's testimony; for while counsel should comment on the evidence, it does not include the right to introduce new elements into the trial, which rests largely in the sound discretion of the trial judge.

APPEAL by defendant from *Shaw, J.*, at July Term, 1914, of MECKLENBURG.

The defendant was indicted for the murder of Dillard Hooker. When the case was called for trial the solicitor did not put the defendant on trial for murder in the first degree, but asked for a conviction of murder in the second degree or manslaughter.

The defendant admitted the killing of Hooker with a pistol, and relied on the plea of self-defense, contending that he was justified in shooting the deceased on the ground that, at the time he shot, he was in danger of being killed himself or of receiving great bodily harm by the deceased.

The homicide occurred in the home of the defendant. There was evidence of a difficulty in the yard of the defendant; that the deceased and defendant went into the home of the defendant, where the deceased was shot; that immediately after the shooting the deceased crawled from the house onto the porch and fell to the ground, and there made his dying statement.

Evidence was introduced by the defendant in support of his plea of self-defense.

The defendant was convicted of manslaughter, and appealed from the sentence pronounced thereon.

*Stewart & McRae for defendant.*
*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

ALLEN, J.   The exceptions relied on and discussed in the briefs are to the exclusion and reception of evidence.

(1) Was the dying declaration of the deceased, that the defendant shot him without cause, competent?

The objection is to the latter part of the declaration, "without cause," and its admissibility depends on whether it is the estimate or opinion of the deceased of the conduct of the defendant or the statement of a fact.

If the former, it ought to have been excluded, and if the latter, it was properly admitted.

Dying declarations are received in cases of homicide from necessity, as otherwise many criminals would escape punishment, and they are frequently made under conditions which render it impossible for the

168—13

declarant to state the circumstances in connection with the killing in detail, and make necessary the acceptance of a statement in the form of a collective fact.

The facts here illustrate such conditions. The declarations of the deceased were made within a few minutes after the fatal shots were fired, while he was in a dying condition and apparently not able to give a minute and extended account of all the circumstances.

Mr. Chamberlayne in his valuable treatise on the law of evidence says (vol. 4, secs. 2849 and 2853) :

"If the judge is able rationally to conclude that a fact stated in a dying declaration is, in reality, one of the *res gestæ,* it will not be rejected because it takes the form of statement appropriate to the assertion of an act of reasoning. . . .

"A sufficient administrative necessity for accepting an inference or conclusion in a dying declaration is furnished where a large number of minute phenomena, often so intangible and interblending as to forbid effective individual statement, are given by the declarant in the form of a 'collective fact,' often the only way in which a speaker can well express himself. Thus, a declarant may properly state that a given shooting was an 'accident' or that he had been 'butchered' by the malpractice of a doctor, and so forth. Even where a considerable element of voluntary or intentional reasoning is present, the declaration may simply amount to the statement of a fact in a vigorous and striking way, summarizing a number of facts in a single vivid expression, *e. g.,* 'He shot me down like a dog.' "

In 21 Cyc., 988, many cases are cited in the note in support of the text, that : "A dying declaration by the victim of a homicide that the act was without provocation, or words of a like import, although very general, is as a rule held admissible as the statement of a collective fact and not a mere conclusion."

In *White v. The State,* 100 Ga., 659, the Court declares that : "The rule of law is that a dying declaration to be admissible must consist of a statement of a matter of fact, and a declaration which amounts to the mere expression of an opinion by the person making it should not be received in evidence. In the course of our examination of the authorities upon that subject we find a well reasoned case cited in the second volume of Taylor on Evidence, p. 470, sub-page 16, in which the doctrine is stated as follows : 'The declarant should state facts rather than conclusions.' *McBride v. People,* 5 Col. App., 91 (1894). 'Where a declarant, however, used the expression, 'He shot me down like a dog" (which is the identical expression complained of), the expression was held to be admissible. Declarations of a party *in extremis,* in order to be admissible, must be as to facts and not conclusions. They are per-

mitted as to those things to which the deceased would have been competent to testify if sworn in the case. But I do not think the expression of the deceased a conclusion. It was given as a part of his narrative relating to the affair, and I think it was merely intended to illustrate the lack of provocation and the wantonness in which the appellant did the act. It was descriptive of the manner in which the act was committed. It conveyed the idea that the appellant disregarded the claims of humanity, and, without giving him any warning, shot him. It was the statement of a fact made by way of illustration.' *S. v. Saunders,* 14 Ore., 300 (1886). So as to the declaration, 'It was done without any provocation on his part.' *Wroe v. State,* 20 O. St., 460 (1870). Or that deceased was 'butchered.' *S. v. Gile,* 8 Wash., 12 (1894). In the case of *Darby v. The State,* 79 Ga., 63, the dying declaration made by the deceased, that the defendant had cut him, and that he had done nothing to cause it, was objected to for the same reason as that urged in the present case against the admission of the declaration now under review; and it was held that the objection to its admission upon the ground that it stated a conclusion rather than a fact was properly overruled."

Where a decedent was asked what reason, if any, a man had for shooting him, and responded "Not any, that I know of," this was held to be admissible. *Boyle v. State,* 97 Ind., 322.

A dying declaration by a deceased person that he made no attempt to injure accused is admissible, being a statement of fact. *Lane v. State,* 151 Ind., 511.

The statement of deceased that "he was not doing a thing" is the statement of a fact. *Pennington v. Com.* (Ky.), 68 S. W. Rep., 451.

A dying declaration, "S. cut me. He cut me for nothing. I never did anything to him," is not incompetent, as an opinion. *Jordan v. State,* 82 Ala., 1; *Sullivan v. State,* 102 Ala., 135.

A fact and not an opinion is stated in a dying declaration: "I have been stabbed by a man that I had no reason to expect a shot from. He had no reason to shoot me. There was no offense given." *S. v. Black,* 42 La. Ann., 861.

A statement that "They had no occasion to shoot me" is a statement of fact and not a mere inference or opinion of decedent. *Pierson v. State,* 21 Tex. App., 14.

The decisions in our own Court are to the same effect. In *S. v. Mills,* 91 N. C., 594, the declaration was "He shot me for nothing," and in *S. v. Watkins,* 159 N. C., 485, "I have done nothing to be shot for," and both declarations were held competent, and in the last case *White v. State,* 100 Ga., 63, from which we have quoted, was cited with approval.

The two relevant facts within the scope of the dying declaration were that the defendant shot the deceased, and as to the conduct of the

deceased, and if the killing was unprovoked and the deceased did nothing, there was no other way to describe his conduct except by saying so, "I did nothing," and the expression, "without cause," is but another form of conveying the same idea.

If, however, it was doubtful whether the declaration was the opinion of the deceased or the statement of a fact, it ought to have been received, and submitted to the jury under proper instructions (*S. v. Watkins, supra*), and as the charge is not in the record, and there is no exception to it, we would assume that the jury was fully informed as to its duties.

We are therefore of opinion there is no error in admitting the dying declaration.

(2) The defendant introduced S. C. Ross as a witness, who testified to a difficulty between the deceased and the defendant in the yard of the defendant, a short time before the killing. After making a statement purporting to cover what he saw and heard, he was asked five or six questions by the defendant, which were excluded.

The court then inquired of the witness:

Q. Do you recall anything you have omitted in your testimony?
A. Yes, sir; one thing.

Q. All right.    A. In driving up to where the men were, I saw Hooker come back on him and strike; I could not see whether he hit him or not, but Mrs. Williams caught his arm.

Q. Is that all?    A. Oh, he kept on insisting there, trying to have Williams acknowledge he could kill him.

Q. You have told that before; anything that you have omitted that Hooker said or did?    A. That is all.

The questions excluded were objectionable as leading, or there was a failure to show what facts would be elicited by permitting them to be answered, and in either aspect cannot constitute reversible error, and the examination by the court is also conclusive that the witness told all he knew.

The defendant also introduced the testimony of this witness before the coroner as corroborative evidence, which was admitted, except certain parts which, in the opinion of the court, were not testified to on the trial.

Counsel for the defendant in their brief institute a comparison between the testimony of the witness before the coroner and upon the trial, as follows, the part excluded being in parentheses:

(1) Before the coroner, S. C. Ross testified that Hooker said, ("Damn you! I am going to kill you.")    In the trial, S. C. Ross testified: "He kept on trying to make Mr. Williams acknowledge that he could kill him, and Williams did not say anything, and Hooker says, 'Damn you! I am going to kill you.'"

(2) Before the coroner, S. C. Ross testified: ("I told Hooker to leave; that he was giving Mrs. Williams a lot of trouble.") In the trial, S. C. Ross testified: "Hooker came right along with us, and I says, 'You had better leave here, Hooker.' I asked Hooker to leave Williams and let him alone, but he went back to the bed."

(3) Before the coroner, witness Ross testified: ("Hooker was drunk, too, but not so helpless as Williams.") In the trial he testified: "Williams was, I considered, very drunk. Seeing the condition of the two men, I was afraid they would get into trouble again. Both men were drunk."

(4) Before the coroner, witness Ross testified: ("Hooker said, 'Yes, damn you, I could have killed you with the hold I had.") In the trial, witness Ross testified: "Hooker kept on trying to make Mr. Williams acknowledge that he could kill him."

(5) Before the coroner, witness Ross testified: ("I went to Mr. Shinn's and told him they were fighting.") In the trial, he testified: "I got in the buggy, and we went on home. We stopped at Mr. Shinn's, and I told him that Williams and Hooker had been fighting."

The first and most important of these comparisons is not sustained by the record, which shows that the witness testified on the trial that Hooker said "Damn you! I can kill you," and not "Damn you! I am going to kill you," and as to the others there is a substantial difference except as to the last, and as to that the witness said at the trial, in addition to the statement before the coroner, that he told Shinn that they were both drunk and Mrs. Williams was not able to take care of them.

If the excluded parts had been omitted, they would have afforded as many reasons for criticising the witness as for sustaining him, and are not of sufficient importance to justify disturbing the verdict.

3. The defendant introduced evidence tending to sustain his plea of self-defense, and, while on the witness stand, offered to testify that the deceased "had told him prior to this time that he had a fight with a man in a hotel at Richmond and had stabbed him twice," which was excluded.

It is well established with us that evidence of the general character of the deceased for violence is admissible in cases of homicide when there is evidence of self-defense (*S. v. Turpin,* 77 N. C., 473; *S. v. Blackwell,* 162 N. C., 680); and there is also authority for the position, and with good reason, that the defendant may also offer evidence of acts of violence coming under his personal observation or of which he has been informed by the deceased (21 Cyc., 960; *People v. Harriss,* 95 Mich., 90; *United States v. Dansmore,* 75 Pac., 33; *S. v. Shadwell,* 22 Mont., 559; *S. v. Sale,* 119 Iowa, 3; *People v. Farrell,* 100 N. W., 264; *S. v. Beird,* 118 Iowa, 478; *Poer v. State,* 67 S. W., 501; *People v. Rodswold,* 177 N. Y., 425); but the evidence excluded does not come within either principle.

The statement that he had a fight and stabbed his opponent twice is consistent with lawful conduct, and is not necessarily evidence of violence. In this case the defendant shot the deceased four times, and he insisted before the jury he had done no wrong.

There was no offer on the part of the defendant to tell all the deceased said, nor that no other statement was made by him.

It is not probable the deceased said, "I had a fight with a man in a hotel at Richmond and stabbed him twice," and nothing more, and he ought at least to have offered to detail the conversation or to say there was none.

There was no offer to prove the general character of the deceased for violence, and all the evidence introduced was that his character was good.

The time of making the statement is not given. It was prior to the homicide, but how long before?

This is material in determining its effect upon the mind of the defendant, and particularly so when it appears that the deceased had boarded with the defendant, and that they were friends up to the fatal encounter.

The defendant did not offer to prove that he believed the deceased to be violent, that he was in fear of him, or that the statement which he says was made to him entered in any way into his right of self-defense.

In the absence of some evidence of this character, a new trial should not be ordered on account of the refusal of the court to admit a statement, which could only be competent as evidence of violent disposition and that defendant knew it, when the statement is consistent with lawful conduct, the time and circumstances under which it was made are not given, the defendant did not offer to prove he believed the deceased to be violent or that he acted upon the statement, and he offered no evidence of his general character for violence.

These are the exceptions chiefly relied on, but we have considered all that are presented in the brief of counsel.

The dying declaration of the deceased was impeached by the evidence of the defendant, and it was therefore competent to corroborate it by evidence of good character or by showing that he had made other similar statements. 21 Cyc., 994; S. v. Thomason, 46 N. C., 274; S. v. Blackburn, 80 N. C., 474.

The dying declarations of the deceased in a homicide case are received as the testimony of any other witness, and their weight and credit is for the jury. S. v. Davis, 134 N. C., 633.

"The same tests to determine their trustworthiness are applicable as are applied to the statements of a witness under examination on oath." Wharton's Criminal Evidence (10 Ed.), sec. 298.

The evidence of the witness Beatty that the defendant was playing and laughing and scrambling in a store several hours before the homi-

STATE *v.* WILLIAMS.

cide was properly admitted to show the condition of the defendant, it being in evidence that he was intoxicated; and the evidence of Brady was competent for the same purpose, to which it was restricted by the court.

There is nothing in the record to indicate what would have been the answer of the witness Norris to the question propounded to him, and for that reason the exception based on the refusal of the court to allow him to answer cannot be considered. *S. v. Leak,* 156 N. C., 644.

The last exception is that, in his argument to the jury, one of the counsel for the defendant proposed to take some disinterested person in the courtroom and demonstrate before the jury on that person the positions that the defendant and the deceased were in at the time of the shooting, as testified to by defendant, in order to show that the wounds would have been inflicted in the body of the deceased at the place and would have had the range or direction which they had as testified to by the doctors.

The defendant Williams, while on the stand as a witness in his own behalf, demonstrated before the jury the position he, the defendant, was in, and the position Hooker, the deceased, was in, and the way Hooker had hold of him when he fired the shots.

We cannot see in this that the defendant has been deprived of any substantial right.

The defendant was permitted to make his demonstration before the jury as a part of his evidence, and it then became the duty and right of counsel to comment on the evidence, but not to introduce new elements. Matters of this kind are left to the sound discretion of the presiding judge.

No error.

WALKER, J., dissenting: Being convinced, after a careful examination of the record, that material errors were committed at the trial, which prejudiced defendant, I cannot concur in the disposition of this case. I will advert to only two or three rulings which I regard as erroneous.

It was important to the defendant that he confirm the testimony of the witness S. C. Ross, and he was entitled, for this purpose, to the entire examination of the same witness taken before the coroner, or at least to so much of it as tended to corroborate him. I cannot adopt the view of the Court in regard to this testimony. In several material respects there was substantial agreement between said examination and the witness's testimony before the court. This can easily be shown by a simple comparison of the two examinations; but my purpose is not to enter upon a minute consideration of the case, except as to one of the questions pre-

sented. As to the others, I merely state the grounds of my dissent without discussion. I cannot agree that the general trend of the testimony taken by the coroner, which the court excluded, was against defendant, and that its rejection, therefore, became harmless.

There was error, in my opinion, in permitting the witness W. S. Brady to testify that the defendant was drinking a few hours before the homicide was committed, and drew a gun on him, or pointed it at him. The solicitor stated that this testimony "was offered to show that the defendant was in such a drunken condition that he was liable to draw a gun on anybody and shoot them." The prisoner objected to the testimony, and excepted when his objection was overruled, and the testimony was admitted by the court. The witness Brady then testified, substantially, that an hour or more before the deceased was killed he stopped at the prisoner's store to leave a milk can, and when he returned for the milk can, and after some conversation with him, the prisoner asked witness to take a drink, and referred to a Mr. Myers, and he cursed a little. Witness then went to pick up the lines which his mule had jerked from his hands while he was talking to the prisoner, and as he was doing so the prisoner said, "Look out! Brady," and aimed his shotgun at him, and Mr. Hooker jerked prisoner back into the store. With reference to this testimony the court said, at the time the prisoner objected to the answer of the witness: "The court admits the evidence only, and it can be considered by the jury only, for the purpose, 'as bearing upon the condition of the defendant at that time, the witness having testified that the defendant was under the influence of intoxicating liquors.' This evidence is admitted only in corroboration of and bearing upon his testimony as to the condition of the defendant at that time, and the jury are so instructed." The witness had stated that, at the time he saw the prisoner, when he returned for the milk can, "he was under the influence of whiskey," at about 4:30 in the afternoon of 17 May. The only bearing of this evidence upon the case would be to show, as the solicitor frankly admitted, that the prisoner, being under the influence of liquor, was "liable to use a gun," from which it might be inferred by the jury that he did use a gun and killed the deceased without sufficient legal excuse. For this purpose it was, to my mind, clearly incompetent and greatly prejudicial to the prisoner, as he introduced strong evidence to prove that he acted strictly in self-defense and under much provocation from the deceased on the prisoner's own premises and in the presence of his wife, who tried to induce him, in an entirely proper manner, to leave and avoid any further quarreling between him and her husband. Whether the prisoner's evidence was true or not, his wife told a very consistent and natural story of the altercation between Dillard Hooker and her husband, but it may have been discarded by the jury for the

reason that Brady testified that he was drinking an hour or so before the killing took place at the home of the prisoner, and therefore was "liable to use a gun." Where evidence is conflicting and the question of guilt becomes a close one, the slightest circumstance may turn the scales against the prisoner. The court admitted the evidence to corroborate the previous statement of the witness W. S. Brady, that the prisoner was drinking at 4:30 o'clock the same afternoon. In other words, his evidence as to what occurred at the store, including the handling of the gun, was allowed to be considered by the jury as tending to show that he was drunk. Well, suppose he was; how does the fact affect the question of his guilt, unless it is used for the purpose of asking the jury to infer that, being under the influence of liquor, he was apt to use a gun afterwards and kill the deceased, without just cause? It was not necessary in order to prove merely that he killed the deceased, for that fact was not only testified to by all the witnesses, but admitted. It could only have the effect of proving, beyond that fact, that the killing was apt to be unjustifiable, and especially is this so in view of what was said by the solicitor at the time he offered the testimony as to his purpose in doing so, the influence of which remark upon the jury was not explicitly or sufficiently removed by the court, in what it afterwards said, and after the answer of the witness had been given. We cannot be too careful to guard the rights of the prisoner under such circumstances, and especially where there is decided testimony as to his innocence, that is, that the act of killing was excusable in law, as done in self-defense. In the absence of a full and proper caution, the jury might well have concluded, from the remark of the solicitor, even when considered with the statement of the court restricting, to some extent, the use of the testimony, that the evidence had the tendency of showing that the prisoner used his gun at the house and killed the deceased without sufficient cause. Such a remark as that, coming from the solicitor, must have made a deep impression upon the jury, not only because it emanated from him as the prosecuting officer, but because he was right when he thought and said that the testimony could only have the bearing indicated by him. Conceding the soundness of the principle, that evidence of intoxication, at the time of the homicide, may be competent and relevant under certain circumstances, the manner in which the testimony admitted in this case was introduced, without properly safeguarding the prisoner's rights in respect to it, was calculated to divert the minds of the jurors from the true issue to irrelevant matters, and, therefore, to prejudice the prisoner. I do not think that the caution of the judge was sufficient in this respect.

There was testimony of defendant's wife as to his condition just before deceased came to his house, which should have been admitted, especially in view of the evidence of the State as to his condition at the time of the

homicide and before that time. For these reasons, and others that might be added, I must withhold my assent to the conclusion of the Court.

I am not prepared to say that the dying declaration was admissible. If a man states that another man has shot him "for nothing," or "without cause," it is equivalent to a charge that he murdered him, and is an expression of an opinion as to the degree of the homicide, for a shooting "for nothing" or "without cause" is murder. But I do not place my dissent upon this ground, though I think the principle is well settled that the dying declaration must be confined to *facts* connected directly with the homicide, and that opinions or conclusions are incompetent and prejudicial.

This Court said in *S. v. Jefferson,* 125 N. C., 712: "The general rule is that testimony, before it is received in evidence, shall be on the oath of the witness and subject to the right of cross-examination. The nearness and certainty of death are just as strong an incentive to the telling of the truth as the solemnity of an oath, but you cannot subject the deceased and what he said as a dying declaration to the test of cross-examination. The exception to the general rule of evidence, therefore, in regard to dying declarations rests upon the grounds of public policy and the necessity of the thing. And as the exception can only be sustained on the grounds above mentioned, such evidence is restricted by the law to the act of killing and those facts and circumstances directly attending the act and forming a part of the *res gestæ,*" citing *S. v. Shelton,* 47 N. C., 360. And Underhill on Cr. Evidence, secs. 108 and 109, thus states the rule: "The declarations should not contain matter which would be excluded if the declarant were a witness. He is beyond the reach of cross-examination to ascertain the grounds upon which his opinion may be based, and other reasons may exist which would exclude his opinion if he were a living witness. Opinions in dying declarations are inadmissible. It is indispensable that the dying declaration should consist solely of facts, and not of conclusions, mental impressions, or opinions. Thus, a statement that the deceased thought or believed the accused had shot him, or that he expected the accused would try to kill him, is inadmissible where the deceased did not see his assailant, but based his declaration wholly upon threats which had been made by the accused. But opinions in dying declarations are admissible whenever they would be received if the declarant himself were a witness. . . . The declaration is admissible only so far as it points directly to the facts constituting the *res gestæ* of the homicide; that is to say, to the act of killing and to the circumstances immediately attendant."

And the same phraseology is substantially used in 3 Rice on Evidence, p. 536: "Matters of mere opinion are inadmissible. Where the declarant merely states his opinion as to the cause of an injury, and such statement would not be received were the declarant sworn as a witness,

it is equally inadmissible as a declaration *in articulo mortis.* In such cases the familiar rule obtains the ascendancy, that the witness must testify to facts and not emit mere opinion," citing *Binns v. State,* 46 Ind., 311; *Wroe v. State,* 20 Ohio St., 460; *Whitley v. State,* 38 Ga., 50. And again at p. 537: "Declarations of the deceased, made when *in extremis,* which are not statements of fact which a living witness would have been permitted to testify to, but are merely expressions of belief and suspicions, are not competent evidence," citing *People v. Shaw,* 63 N. Y., 36. Referring to the dissenting opinion of *Mr. Justice Zollars,* in *Boyle v. State,* 105 Ind., 469 (55 Am. Rep., 218), Mr. Rice says, at pp. 537, 538: "Much of the foregoing discussion is embodied in the dissenting opinion of *Mr. Justice Zollars* of the Indiana Supreme Court of judicature in the case of *Boyle v. State,* 105 Ind., 469, 55 Am. Rep., 218, decided in 1885. It is seldom, indeed, that any opinion is so critical in its analysis, so exhaustive in its citations, or so logical in its conclusions. Any discussion of this subject which omits a careful consideration of this case must be regarded as grossly imperfect. The principal opinion was delivered by *Mr. Justice Elliott.* It is a very ingenious argument in favor of the prevailing view. But while perfectly aware that my function as a text-writer will not tolerate the least attempt to make a law, I submit the dissenting opinion of this exceedingly able Court contains the statement of the better view, both upon principle and authority." He further says, at p. 536, that decisions may be found which apparently support the contention that dying declarations are admissible which were not clearly restricted to a statement of the vital *facts* immediately connected with the homicide, for the purpose of proving the *corpus delicti,* but which seemed also to contain an expression of opinion upon the facts; but he examines some of the cases and shows that they were dependent upon peculiar facts not directly involving the question, and were really admitted only to prove the *corpus delicti;* and in this connection he states that one feature of this peculiar grade of evidence must be clearly outlined. The *nisi prius* courts upon which ordinarily devolve, in the first instance, the trial of those cases which present questions as to the admission of dying declarations, are frequently misled, by the conflict in adjudication, and the plausibility of argument, into the admission of evidence that represents a conclusion or opinion of the declarant. And in *Shaw v. People,* 3 Hun., 372, it was said to be even more important to exclude an opinion, declared *in articulo mortis,* than in an ordinary case, where the witness may be subjected to a cross-examination and other tests to appraise the value of his opinion.

As I have already said, it is not necessary that my nonconcurrence with the Court should be based upon the incompetency of the dying declaration.