Holt *et al. v.* State.

(*Nashville,* December Term, 1935.)

Opinion filed April 4, 1936.

CUMMINGS & MELTON, of Woodbury, for plaintiffs in error.

C. C. WARDEN and EWELL & EWELL, of Manchester, and W. F. BARRY, JR., Assistant Attorney-General, for the State.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Plaintiffs in error appeal from a conviction of voluntary manslaughter, with a prison sentence of two years, in the killing of Jess Anderson by stabbing with a pocket-knife. The Holts are cousins, young men of 23 and 24 years, respectively. Elvin Holt says that it was he who used the knife, and there is no doubt on the record that this is so; and we find no evidence that Hoyte Holt was armed at all, or engaged in the fight, although he was present. The only apparent theory upon which his conviction could be rested is that the knife used was his and that, shortly before, he handed it to Elvin, at his request, to be used for their protection from a threatened assault by the deceased. The killing took place in the public road near a country church which the young men were all leaving, after a night service there. The Holts lived in that neighborhood. The deceased and two companions, one a brother, Ode Anderson, 18 years old, and the other, Edgar Lewis, a boy of 16, lived in Coffee county, some five miles distant. They rode over horseback and hitched their horses some mile or so away, and then went to the church grounds. It does not appear that they entered the building, or came in contact with the Holts until after the service. There is no evidence

of any former differences between the young men and, indeed, their acquaintance had been slight.

Jess Anderson and his companions had been drinking when they reached the church grounds, and we think it clear that his intoxication was the cause of the trouble. This induced in him a fighting mood and led him to pick a quarrel with the Holts. He brought with him on the trip a razor and, missing it, appears to have conceived the idea that one of the Holt boys, whom he met as they were all leaving the church grounds, had his razor. When accused by him they offered to be and were searched. It developed that Ode had had the razor and that it had fallen from his pocket on the ground and had been picked up by Edgar Lewis. The deceased and his two companions proceeded along the road, in a direction opposite from the place where they had left their horses, following the Holts as they proceeded homeward. According to plaintiffs in error and Frank, a younger brother of Elvin, fourteen years old, Jess was proposing to fight them and threatening serious violence to them. We think this is the clear weight of the evidence. It was as the party thus worked their way down the road, the Holts declining to fight, that Elvin asked Hoyte for his knife, saying, as they testify, that he apprehended a deadly assault by the deceased, who was a man of about 35 years of age. The Holts say that the deceased finally ran around in front of Elvin Holt, as he was rapidly going down the road, and struck him with something in his hand, when he struck back with the knife; that just then Ode Anderson struck him in the back and cut him; that he then turned on and cut Ode slightly with the knife.

The account given by Edgar Lewis, introduced by the

state, differs only in detail from that stated above, with this exception, that he says that as the crowd left the church the Holt boys invited the party into a "cedar lot" near the road and set up the drinks—liquor in a fruit jar. In this he is corroborated by Ode Anderson, brother of the deceased. The Holts all deny this. However, whoever supplied the liquor at this time, there is no dispute that the deceased had more than his proper share and behaved accordingly. This witness Lewis makes no denial of this and says that following the "search" for the razor (which he says he had taken), the deceased threw aside his hat and vest and proposed to engage the Holts in combat; that when the Holts declined he followed them up the road. His testimony reads: "Pretty soon Jess Anderson came back to the fence and said that the Holt boys wanted to fight Ode Anderson, and Hoyte Holt then said that they did not want to fight Ode, that Ode was drunk. I then told the boys not to have any trouble. Ode Anderson and I got over the fence and into the big road. Jess pulled off his coat and hat and said he would fight him fair. The boys then went up the road except me, and the Holt boys were in front and Jess followed next to them, and Ode behind. I heard a lick and a grunt and Jess fell. Elvin Holt stabbed Jess."

It will be observed that this witness does not undertake to say who passed the first blow. His description is exceedingly meager. But Jess Lewis, a second cousin of Edgar, testified that he had a conversation with Edgar shortly after the affray, and that Edgar then said to him that "Jess Anderson struck the first lick" and that he did not know whether Anderson had anything in his

hand or not. Floyd Lewis, who is an uncle of Ed, testifies that Ed Lewis told him after the difficulty that Jess and Ode followed the Holt boys up the road and that he (Ed) could not say how it occurred, but that after Jess fell he threw a flashlight on the body and ground and saw a knife lying on the ground six inches from Jess' hand. Other witnesses testified to having seen this knife, but there was testimony offered by the state that Jess did not own such a knife, and the state's theory apparently was that the knife had been "planted."

As further illustrating the partial intoxication and the offensive and belligerent effect thereof on Jess Anderson, Ace Arnold testified that he saw Jess Anderson on the church grounds while the preaching was going on and that he walked up to him and said, "What will you give me to whip you?" To which he replied, "I would give $1.00." That Jess said, "I could shoot you," and pulled a razor and said "that could cut a man's head off." "He laughed and put it up. I thought he had a drink or two." Also, El Fleming testified that he saw Jess on this occasion and that he was drunk, and that he told Jess that he had better be careful, or the officers would get him, and Jess then snatched a knife out of Clarence Prater's hand (a bystander), when Prater stepped in between them. The witness said that he had known Jess only slightly. There was an attempt to impeach this witness on cross-examination by asking him if he had not stated in the presence of the Attorney General some time before that he knew nothing about this lawsuit, to which he replied that he recalled having some conversation, but that he did not want to get mixed up in the matter; that he had said that he "did not see the Holt boys that

night." Of course, this was not inconsistent with the testimony which he gave. He did not undertake to testify at all as to the difficulty.

As before stated, there is no suggestion in the record of any previous ill will between the parties, and no reason whatever suggests itself as to why the Holts should have assaulted the deceased, except in self-defense, as testified by them, unless the testimony of one Carmack Knox furnished a clue to a motive. This witness testified that he had a conversation with Elvin Holt that night after church, in which Holt said to him, "A bunch of us boys want to run the Fudge Around boys off," to which he said he replied that he would not have anything to do with it. On cross-examination it developed that this witness was angry with the Holt boys because of a claim he was making that they had cut his horse's tail off shortly before. It developed that he had refused to communicate to counsel for the defense his proposed testimony, so that they were taken unawares. In this connection it appears that affidavits were presented from apparently unimpeached witnesses on the motion for a new trial, one by the father-in-law of this young man, showing that young Knox was asked about a rumor that he would testify as he did, and that Knox at that time stated that he would say nothing of the kind, and that he had never heard of such a thing; that is, that Elvin Holt had said anything to him about running the Fudge Around boys off.

We are not disposed to give credence to this testimony of Knox. Not only is his testimony weakened, if not destroyed, by his admitted ill feeling toward the defendants and the affidavits introduced on the motion for a new

trial, but this theory is utterly at variance with all of the testimony as to what occurred. There is absolutely no suggestion on the part of any of the witnesses to the occurrence that the Holt boys in any way provoked the difficulty.

In our view the only debatable question on the practically undisputed record is as to whether or not Elvin Holt was justified in using a knife in repelling the assault made on him by this partially intoxicated man, it not being clearly established that in making the assault on the Holts the deceased was using a deadly weapon. It will be remembered that it was after dark, and the practically undisputed proof is that the Holts were seeking to avoid a difficulty with the deceased, and leaving the scene as rapidly as they well could, and were pursued with threatening language by the deceased up to the point where the licks were interchanged.

In this situation the degree and reasonableness of the apprehension which the defendant Elvin Holt entertained of death or great bodily harm becomes important. It will be remembered that the deceased had been in possession of a razor, and it is not clear that the defendant knew that he had not regained possession of it. Also the proof shows that the deceased was a large and muscular man and that he had made violent threats against the Holt boys as he followed them down the road. Also a number of witnesses were introduced who testified that the general reputation of the deceased for peace was bad, and it quite clearly appears that the Holt boys were aware of this reputation.

In this connection it is pertinent to refer to assignments of error which complain of the action of the trial

judge in refusing to admit certain testimony; also in charging the jury on the law of self-defense.

We here quote from the transcript that portion of Elvin Holt's testimony in which he narrates his version of the stabbing, together with the record of the objection made by the state to a portion of the testimony offered, and the ruling of the court thereon:

"The three boys were drinking and when we came up Jess Anderson asked which one of us boys had his razor. We saw that they were drinking and told them that none of us had the razor and if they wanted to they could search us, and one of the boys searched me, and I had a piece of an old file which I had been using as a screw driver in my pocket and had been using that day tightening up an old shotgun. Hoyte Holt had a knife in his pocket. After they searched us some one of them picked the razor up off the ground pretty close to Ode Anderson's feet. When we started on walking towards home Jess Anderson said for us to wait he was going to kill every damn one of us. We told him that we did not want any trouble, and just kept moving on at a peart gait between a walk and a run, and Jess Anderson and Ode Anderson followed after us. As they followed us I said to Hoyte, 'Give me your knife, they are going to kill everyone of us,' and Hoyte reached me his knife. When we had gone several steps up the road they overtook us, and Jess Anderson ran around in front of me and struck at me with something in his hand, and I struck at him with the knife which Hoyte had handed me. I stabbed him. I struck him somewhere in the front and while this was being done Ode Anderson cut me in the back and I wheeled on my feet and struck Ode Anderson one lick. I struck Jess Anderson one lick and Ode An-

derson one lick, and turned again and kept moving on in a run until I overtook Hoyte and my little brother Fred who had gone ahead of us. At the time I struck Jess Anderson and Ode Anderson I thought they were about to kill me. Ode cut me with something, but I do not know what he had. I had known Jess Anderson for some time, and knew that he was a bad man. I had seen him drunk on numerous occasions, and had always heard that he was a violent man, especially when drinking and I knew that he and his brother could easily kill all of us. I had been told by different people of violent things he had done to others especially when he was drinking. I knew that he was mad at Lee Holt and some of Lee Holt's boys.''

Thereupon counsel for defendants asked him to name the different persons who had told him (defendant) of acts of violence towards other persons on the part of Jess Anderson, and to state when and where such persons had told him, and what was said. Thereupon the state objected to such testimony, and the court sustained such objection made by the state, and ordered defendant witness not to answer the question. Thereupon counsel for defendants asked the court to have the jury retire in order that they might have the record show defendant's answer. The jury retired and the defendant testified as follows, in the absence of the jury:

''Lee Holt told me before my trouble with the Andersons that about a year before that time Jess Anderson was drunk at church at Gilley Hill and had a knife out, and was trying to fight different people and had to be arrested, and said that Jess Anderson was a bad character and a dangerous man.

"Jim Duke, a Deputy Sheriff, told me a little while before our trouble, that he was called to the house of Novella Duke near Hollow Springs one night, and found Jess Anderson in the act of breaking down the door of her home, and that she was making her escape through a window and told him that Jess Anderson was trying to take her life. She was living with her small children at the time.

"Castel Simmons told me a few weeks before this trouble with the Anderson boys that he was at Hoodoo at meeting one night, and that Jess Anderson was there drinking and raised a fuss with a boy the name of Dewey Parker for no reason at all and would have shot the Parker boy with a pistol if he (Simmons) had not knocked Jess Anderson's hand up.

"Frank Delong told me several months before our trouble that Jess Anderson came to his house one night two or three years ago while he was away from home and nobody at home except Mrs. Delong who is about 60 years old and robbed them of several articles and that Mrs. Delong recognized him.

"Richard told me a little while before our trouble with the Andersons that at about a year before that Jess Anderson ran his brother, Will Anderson, across a field near the Anderson home with a knife open in his hand threatening to kill Will Anderson and would have done so except for the fact that Will Anderson got away from him.

"I, myself, saw him at Gilley Hill one Sunday at meeting drunk and running his horse up and down the road and through the crowd."

"Thereupon the Court ruled that the last statement was competent to go to the jury.

"Thereupon, the jury returned into Court and the defendant witness, Elvin Holt, repeated to the jury that a few years ago he had seen Jess Anderson at ¡Gilley Hill meeting house drunk and running his horse up and down the road and through the crowd.''

Elsewhere in the record it appears, as before stated, that the defendants were permitted to introduce testimony as to the general reputation of the deceased for peace, and it appears from the foregoing that the court permitted the defendant himself to testify to what he had himself personally seen. The complaint is that the court refused to permit the defendant to tell the jury of recent acts of violence, particularly of conduct showing his dangerous character when under the influence of drink, of which he had been informed. It is plausibly urged that the testimony should not have been thus limited; that the specific inquiry before the jury was with respect to the state of mind of the defendant at the moment he struck the blow. The jury has found, as it is conceded, that he acted without malice, and there was material evidence to support the theory of self-defense. It must be conceded that the circumstances clearly justify some degree of apprehension in the mind of the defendant of danger from the deceased. To what extent was he justified in apprehending that the deceased would inflict upon him great bodily harm or death? As bearing upon this issue, it is generally recognized that threats communicated to a defendant may be proven. In extension of this principle, it is a general rule that proof of the reputation of the deceased may be interposed, there being no doubt that the apprehension of danger from an assailant would be increased by consciousness that the assailant bore a reputation for

violence. But the position of the state, sustained by the action of the learned trial judge, was, and is, that it is not competent to go further and permit the defendant to testify that he had been informed that his assailant had committed various other vicious assaults with a deadly weapon, by way of justifying his apprehension that he was about to commit a similar assault upon him. It can hardly be denied that knowledge of what a man has previously repeatedly done would be ground, in any reasonable mind, for increased apprehension that he might do the like again.

Counsel for the state concede that there is a division in the authorities on this question. We find little discussion of the precise proposition, either in our reported cases or elsewhere. In *Jackson* v. *State,* 6 Baxt., 452, in which previous communicated threats were held admissible to show that the defendant might have acted upon a reasonably grounded belief that he was in danger of death or great bodily harm, the court approved the admission, also, of evidence of general reputation, but declined to approve the admission of evidence of specific acts of hostility towards other parties. And in *Fitzhugh* v. *State,* 13 Lea (81 Tenn.), 258, this ruling appears to have been incidentally approved. But beyond the suggestion that this might bring into the case a collateral point, there was no reasoning of the issue in either opinion. On the other hand, we find, in Am. & Eng. Ency. (2 Ed.), vol. 5, p. 877, this note to a text statement of the general rule that evidence must be confined to general reputation, and that particular acts, or specific facts, are not admissible as to character: *"Exceptions—Violent acts of the deceased known to the defendant.* In a prosecution for homicide in which it was ruled that

evidence of the character of the deceased for violence was admissible, it was held that not only the general character of the deceased, but also specific acts of violence within the knowledge or observation of the defendant, might be shown. *People* v. *Harris,* 95 Mich., 87 [54 N. W., 648, 650]. To the same effect are *Hurd* v. *People,* 25 Mich., 405; *People* v. *Lilly,* 38 Mich., 270.''

In 30 Corpus Juris, p. 236, it is said that where there is a claim of self-defense supported by any evidence, ''previous acts of violence by decedent toward accused and others in his presence, and information to accused of other such acts by decedent may be shown,'' this as illustrating to the jury the condition of the defendant's mind.

In the course of a well-reasoned opinion in the Michigan case of *People* v. *Harris, supra,* the court said: ''Knowledge obtained from others or from personal observation of particular acts of violence would be as likely to affect the mind of the prisoner as general information that he might have obtained in common with the community that deceased was a man of high temper.''

The opinion in the case of *State* v. *Hanlon,* 38 Mont., 557, 100 P., 1035, 1040, deals very fully with the subject. It was therein said, by way of argument, that: ''Naturally, after the defendant had been informed of the conduct of the deceased on the previous night . . . he would be more likely to attribute a dangerous import to any motion or action of apparent aggression by the deceased than he would otherwise have done, and justly so. The question for the jury to decide was, not whether it was really necessary for the defendant to defend himself, but whether it appeared to him, as a reasonable man, that the danger was imminent and the necessity press-

ing.'' BRANTLEY, Chief Justice, cites in support the following authorities: 1 Wigmore on Evidence, sec. 248; *People* v. *Harris,* 95 Mich., 87, 54 N. W., 648; *Boyle* v. *State,* 97 Ind., 322; *Childers* v. *State,* 30 Tex. App., 160, 16 S. W., 903, 28 Am. St. Rep., 899; *Cannon* v. *People,* 141 Ill., 270, 30 N. E., 1027; *Sneed* v. *Territory,* 16 Okl., 641, 86 P., 70, 71, 8 Ann. Cas., 354; *State* v. *Beird,* 118 Iowa, 474, 92 N. W., 694; *State* v. *Hunter,* 118 Iowa, 686, 92 N. W., 872.

The opinion quotes from and approves the following from *Boyle* v. *State,* 97 Ind., 322: ''As, in personal conflicts, every man is permitted, within reasonable limits, to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances, and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him, and connected with the deceased, which was fairly calculated to create an apprehension for his own safety. Any narrower rule than this would, we think, prove inadequate to full justice in all cases of homicide, and would, in many cases, operate as a serious abridgment of the law of self-defence.''

In 1 Wharton's Criminal Evidence (10th Ed.), sec. 63a, it is said: ''Where the evidence tends to prove that the accused acted in self-defense, evidence of the violent and dangerous character of deceased, known to the defendant, is admissible as tending to characterize the acts of the deceased, as bearing on the reasonableness of defendant's apprehension of danger at the time of the homicide.'' The learned author cites *Com.* v. *Tircinski,* 189 Mass., 257, 75 N. E., 261, 2 L. R. A. (N. S.),

102, 4 Ann. Cas., 337; *State* v. *Turpin,* 77 N. C., 473, 24 Am. Rep., 455, and refers to the note in 3 L. R. A. (N. S.), 352.

This exception to the general rule restricting character evidence to general reputation is supported by reason. When a case narrows to the inquiry as to the degree of reasonableness of the apprehension in the mind of the defendant when he finds himself in a position in which he must instantly determine when, or whether or not, to strike, and when it is conceded that it is permissible for his judgment to be affected by the character of his antagonist for violence, there would seem to be no escape from the further concession that his judgment would be even more directly affected by knowledge of recent specific unrestrained violence. All men well know that the average mind responds more readily to knowledge of specific conduct than to impressions based on general reputation. To illustrate: An officer in performance of his duty approaches B to place him under arrest. Defying and resisting arrest, B threatens the officer. What more convincing basis of apprehension of danger from B could that officer possibly have than reliable information that two days before B had shot and killed another officer approaching him on a like mission, and that week before last he had committed a like offense, and that he was charged with having slain in brutal and violent fashion an inoffensive citizen? Is it possible that the court should decline to permit this officer, when on trial for shooting down B, to tell the jury that he was apprehensive of death or great bodily harm and that he fired as quickly as he did because this apprehension was intensified by knowledge of these specific recent offenses, strongly indicative of the readiness of B to repeat?

■ However, while, as indicated, we are of opinion that the learned trial judge should have admitted this testimony by the defendant, subject to the right of the state to disprove defendant's claim that he had received such information, we are not prepared to hold his refusal to do so reversible error, for the reason (1) that we are unable to say that this ruling affected the result. This evidence would have been cumulative only, the record otherwise perhaps sufficiently showing the character of the deceased, and the knowledge thereof by the defendant. And also because (2) we have reached a conclusion on the facts of the case, as will hereinafter appear, which makes it unnecessary to so hold.

Complaint is made that in his charge to the jury of the law of self-defense, the court said that the defendant "ought to be able to show to your satisfaction that such defense was absolutely necessary," etc. The particular objection is to the use of the word "absolutely." This phraseology was employed by CARUTHERS, J., in the leading case of *Rippy* v. *State,* 2 Head, 217, and the word "absolutely" has been employed repeatedly in our opinions in this connection since. However, the court concluded this paragraph of the charge with this expression: "In the language of the old law writers upon this subject, it is said, 'that he must give back to the wall.'" While this is the rule which has been followed in a number of jurisdictions, we are not aware of any decision in this state which applies this rule, except in that class of cases in which the slayer provoked the difficulty, or was the original aggressor. It is interesting to observe that while two lines of decisions are cited by the Am. & Eng. Ency., vol. 25, p. 272, and practically all of the states are cited under the caption (1) "neces-

sary to retreat," or (2) "unnecessary to retreat," Tennessee is not included under either heading. The latter view is said to be supported by the most eminent English text-writers upon the subject.

 This particular question is not directly raised by any assignment in this case, and we find it unnecessary to decide it, more particularly for the reason, as indicated by what has been said in our review of the facts, that we are of opinion that there is practically no evidence to sustain the conviction of Hoyte Holt, and that the evidence preponderates against the conviction of Elvin Holt, and that for this reason the judgment must be reversed and the case remanded.