## THE STATE v. MARY E. WILSON, Appellant.

### Division Two, May 20, 1913.

1. **INSTRUCTIONS: Convicted of Lower Degree of Crime: Renders Harmless Error in Instruction on Higher Degree.** Conviction of a lower degree of a crime renders harmless error in an instruction as to a higher degree.

2. **EVIDENCE: Declarations of Deceased: Not Admissible: Mere Hearsay.** In the trial of a woman for the killing of her husband it was proper to exclude testimony of statements of the murdered man made before the shooting, to the effect that he had forced his wife, at the point of a pistol, to write a letter incriminating herself. The State sustains no such relation to the party injured as will make his declarations admissible against the State when such declarations are not admissible as dying declarations or as a part of the *res gestae*.

3. **————: Threats and Violence of Deceased Toward Defendant: Admissible Unless Cumulative.** In trials involving the question of self-defense the better rule is to allow all evidence of threats or violence of deceased toward defendant, limited only by a very sound discretion, but the rejection of evidence merely cumulative will not work a reversal.

Appeal from Butler Circuit Court.—*Hon. Jesse C. Sheppard,* Judge.

AFFIRMED.

*Phillips, Lentz & Phillips* for appellant.

*John T. Barker,* Attorney-General, and *Thomas J. Higgs,* Assistant Attorney-General, for the State.

ROY, C.—Defendant was charged with murder in the first degree. The jury convicted her of murder in the second degree, but failed to agree on the punishment. The court sentenced her to ten years in the penitentiary, and she has appealed. She shot and killed her husband, Martin Wilson, in Poplar Bluff, on November 5, 1911. They were mar-

ried in 1897 in Memphis, Tenn., and lived most of the time after that at Poplar Bluff. He had been for about ten years prior to his death a railway mail clerk, running out of Poplar Bluff a part of the time to Memphis, Tenn., and at other times to Helena, Ark. Defendant taught in the colored school at Poplar Bluff for three years, ending in May, 1910. On the trial numerous witnesses testified as to the good reputation of both of them for peace and quiet prior to their estrangement in the fall of 1910. There was only one child, a son, whose age is not given. · In September, 1910, she and the son entered Lincoln Institute. While there, about November 23, 1910, she made a trip to · Washington, and New Haven, Missouri. Following that trip, the husband accused her of infidelity and quit paying her bills. In January, 1911, she went from St. Louis to Poplar Bluff and there sued him for divorce and immediately returned to St. Louis. Later she brought another divorce suit in St. Louis and dismissed the one in Butler county. On September 26, 1911, while visiting her mother in Arkansas, she was riding in a buggy with a "gentleman friend," and by some accident her leg was injured. She testified it was broken, but said the doctor did not say it was broken and did not set it. About a week after, she went on crutches to St. Louis. The husband sued her in the Butler Circuit Court for divorce, charging infidelity, indignities, cruelty and extravagance. That suit came on for trial October 19, 1911, and she made default, and a decree of divorce was rendered in his favor. About the last of October, 1911, defendant purchased a .38 calibre revolver in St. Louis, and on the night of November 4 she went on the train to Poplar Bluff, arriving here about two a. m. of Sunday, November 5. · She had the pistol with her in a handbag. · She did not go to any house, but remained on the street until about 4:50 a. m. At that time she was in front of the residence of Grant Gleason on Oak street

She had the pistol in her hand. Her husband came in from his regular run on a train which arrived at 4:25 that morning, and he registered according to custom at the post office at 4:40 a. m. He was passing at 4:50 a. m. on the north side of Oak street, going west in front of the Gleason residence. There was a large tree about eighteen inches in diameter standing near the Gleason house, just at the edge of the sidewalk, where there was no fence.

Grant Gleason and his wife testified that they were awake and that without any previous noises of any kind, a shot was heard. Immediately some one on the outside seemed to be saying, "Oh, Mama." They went out and found Wilson lying on the sidewalk with his head to the west and his feet about three feet from the tree. He was saying, "Oh, Mary, oh, Mary." Defendant was apparently working over or about him. She backed some distance to the west. He jumped up and ran east. She fired again and ran after him, and later on fired the third shot. He fell a block or two away. She returned to the place of the shooting. The three witnesses of the Gleason household testified that about that time a woman's voice outside of the house said, "There is one more I want to get, they swore lies on me."

Wilson received only one wound, which passed through his right arm about four inches below the shoulder and directly through the lung, neither turning up nor down nor to the right nor left. He died the following night.

She testified that in May, June and August, 1910, he choked and beat her. Being asked whether at any time prior to 1911 he had ever struck, beat or choked her, she answered "he has always done that." She testified that she was selling hair oil and face lotions while at Lincoln Institute, and went to Washington and New Haven, Missouri, for that purpose. That he ordered her to leave Lincoln Institute and that in Jan-

uary, 1911, he compelled her at the point of a revolver to write a letter inculpating herself in connection with another man.

The defendant then made the following offer of evidence: "By Mr. Lentz: We make the offer now, to prove by this witness a continual line of abuse, mistreatment and assaults, going back and covering a period, assaults by the deceased upon this witness, going back and covering a period of about fourteen years before their final separation; and we propose further to show that during this—during this whole time of fourteen years, that there was scarcely a month and sometimes several times a month, in which the deceased cruelly beat, choked, and otherwise mistreated this defendant. We offer to prove that by this witness."

To which the court sustained an objection and the defendant excepted.

Several witnesses testified to brutal treatment of defendant by deceased. One witness stated that he twice found him beating her with a stick of stove wood, and on another occasion found him choking her. Without setting out that witness's testimony, we will say that there is much about it calculated to render it doubtful. There is evidence tending to show that his treatment of her at times was cruel and abusive. There was also evidence tending to show several threats made by him against her. The court records in the divorce suit brought by him against her were read in evidence without objection.

While the witness Hicks was on the stand, the defendant made the following offer of evidence:

"By Mr. Lentz: The defendant offers to prove by this witness the following facts: That after the commencement of the divorce suit by Martin Wilson against his wife in the circuit court of Butler county, and on or about the 28th of August, 1911, this witness had a conversation with Martin Wilson, the person

whom this defendant is charged with killing, and the plaintiff in that case, in which Wilson said to this witness in substance that he had procured the statement or letter from the defendant in that case, and the defendant in this case, to the effect that she had been guilty of criminal intimacy with one Fred Parker at some place in the city of St. Louis. That he also stated that he had compelled the defendant to write that letter as he dictated it; and that at that time he had a revolver in his hands; and by that means compelled her to write the letter. We offer to make this proof by this witness. And I think it is competent, for the reason that the State has introduced in evidence in this case a petition for divorce in which he charges this defendant with being guilty of criminal intimacy with this same Fred Parker named in the letter or statement before referred to; and that the defendant has testified that that statement is untrue.''

To which an objection was sustained by the court and the defendant excepted.

. David R. Graham and his wife testified for the defendant: "That on that morning about five o'clock, or a little after, they passed along that street, and right at the point described by the defendant they found a man's hat and a woman's hat, and a piece of cloth that looked as though it had been a part of a scarf or a veil, and in that was a large wad of woman's hair, which they said was about the same color and general appearance of the hair of this defendant.''

The defendant testified that she did not want to go to Lincoln Institute and that deceased compelled her to go. She also testified that she employed counsel to defend the divorce suit brought against her, but that she was in the hospital with her broken leg at the time it was tried, and that no one appeared for her, and that she got out of the hospital about October 26 and went to see her attorneys who advised her to go to

Poplar Bluff to see about the case. Her account of the tragedy is as follows:

"Well, I came here on No. 5 that morning of November the 5th, and of course, I didn't have enough money to get me a rooming place; and I had been told that I had no friends down here; that everybody had turned their backs on me. I had no place to go, and of course, I started out to Mrs. Smith's; and I felt a little timid; I didn't feel that I could be turned out by her. So I decided—I thought about Mrs. Blue, a friend of mine; and I said that I would see her, I could venture over to her house, probably she would not turn me out. I came back down to Fourth street and turned west on Oak street; and there at the crossing—the Frisco crossing, I dropped my scarf pin, and while there looking for it, I heard some one coming behind me, and I turned and saw a man; and of course, he came up and he spoke to me, and I spoke to him; and he says, 'Oh,' says, 'Mary, what are you doing here?' I said, 'I came to see if you were willing to give me anything.' He took everything, even the child, robbed me of that. 'I have nothing, I haven't money enough to secure a rooming place tonight.' And he wheeled and grabbel me then and says, 'I'll kill you!' and he grabbed me in the top of the hair, and, of course, by some luck I was fortunate enough to pull loose from him, and as I got away, I happened to have a revolver with me; and as I pulled loose, he kinda turned aside, and I suppose he must have seen my gun; and, of course, I shot him then."

The court instructed the jury on murder in the first and second degrees, and on manslaughter in the fourth degree, and on self-defense, reasonable doubt, presumption of innocence and good character. The defendant asked some instructions, but in so far as they were correct they were covered by those that were given.

I. It is claimed that there was no evidence to
**Instructions.** show murder in the first degree, and that no
instruction should have been given on that degree. We
hold that there was evidence tending strongly to show
that defendant lay in wait and shot deceased while he
was unaware of her presence. Besides, when one is
convicted of a lower degree of the offence, an error in
an instruction as to a higher degree is harmless. [State
v. Stockwell, 106 Mo. 36; State v. Grote, 109 Mo. 345.]

II. No error was committed in excluding the evi-
**Declarations** dence of the witness Hicks to the effect
**of Deceased**
**as Evidence.** that the deceased told him that he had com-
pelled defendant to write the incriminating letter.

It was held in State v. Curtis, 70 Mo. l. c. 597, that
the State sustains no such relation to the party in-
jured as will make his declarations admissible against
the State when such declarations are not admissible as
dying declarations or as a part of the *res gestae*. To
the same effect is State v. Punshon, 124 Mo. l. c. 457,
and cases there cited.

III. Complaint is made that the trial court erred
in excluding evidence of defendant that she
**Threats and** had been continuously abused by deceased
**Violence**
**Of Deceased.** during the whole period of her married life.
There was much evidence on the subject of
his abuse of her. She testified to various instances
of abuse in 1910, and stated that he had always treated
her that way. Threats and acts of violence by deceas-
ed toward defendant in cases involving the question of
self-defense are competent for two purposes; to show
which party was the probable aggressor, and to show
what, if any, grounds of apprehension the defendant
may have had. It has been held that the remoteness
of threats from the date of the homicide does not ef-
fect their competency as evidence. [State v. Glahn, 97
Mo. 679; State v. Whitsett, 232 Mo. l. c. 529.] From

all that we can find in the authorities there is no reason why acts of violence by deceased toward defendant should be considered differently. We think the better rule is to allow all evidence of threats or violence of deceased toward defendant, limited only by a very sound discretion. It is said in 1 Wigmore on Evidence, sec. 248: ''The true solution is to exercise a discretion and to admit such facts when common sense tells us that they would legitimately affect a defendant's apprehensions. The state of the law in more recent times has come on the whole to favor the admissibility of such facts.''

In Boyle v. State, 97 Ind. 322, 326, it was said, ''As in personal conflicts every man is permitted within reasonable limits to act upon appearances and to determine for himself when he is in real danger, it would seem to follow, as an inevitable consequence, that whoever relies upon appearances and a reasonable determination upon such appearances, as a defense in a case of homicide, ought to be allowed to prove every fact and circumstance known to him and connected with the deceased which was fairly calculated to create an apprehension for his own safety.''

Cumulative. However, it was held in a similar case of State v. Nelson, 166 Mo. l. c. 204, that the rejection of merely cumulative evidence will not work a reversal. Now in view of the fact that abundant evidence of violence by deceased towards defendant was admitted, including the statement of defendant, that ''he had always done that way,'' we are satisfied that the jury convicted her in the belief founded on the evidence that she armed herself with a revolver in St. Louis, went to Poplar Buff, arriving there at two o'clock a. m. and waited on the streets until 4:50 a. m., when she shot him as she stood behind the tree and while he was passing with his right side towards her. We are satisfied that the additional evidence offered

would not have changed the result, and its exclusion is not reversible error.

The instructions given are remarkable for their clearness, completeness and fairness. Those offered by defendant were fully covered by those given by the court, except in so far as those offered by the defendant were wrong.

The judgment is affirmed. *Williams, C.*, concurs.

PER CURIAM.—The foregoing opinion of Roy, *C.*, is adopted as the opinion of the court.    All the judges concur.