[Criminal No. 587. Filed November 3, 1924.]

[229 Pac. 1032.]

# RAFAEL MENDEZ, Appellant, v. STATE, Respondent.

1. HOMICIDE—WHEN GENERAL REPUTATION OF DECEASED AS DANGEROUS MAN MAY BE SHOWN STATED.—Where it is questionable as to which was aggressor, or where defendant's state of mind at time of affray is in issue under claim of justification, deceased's general reputation as dangerous man may always be shown, but such evidence is not competent unless deceased may have been aggressor, or may have made some demonstration threatening life or great bodily harm.

2. HOMICIDE—RULE STATED AS TO RIGHT TO SHOW SPECIFIC ACTS OF VIOLENCE OF DECEASED TOWARDS THIRD PERSONS.—Where facts show *prima facie* case of self-defense, accused should generally be permitted to introduce evidence of specific acts of violence by deceased towards third persons within his knowledge.

3. HOMICIDE—PURPOSE OF SHOWING PREVIOUS ACTS OF VIOLENCE BY DECEASED TOWARDS THIRD PERSONS STATED. — Previous acts of violence by deceased toward third persons, when bearing some relation to one in which homicide occurs, are permissible to help determine whether defendant acted in good faith under apprehension of losing his life or suffering great bodily harm.

4. HOMICIDE—OFFER OF PROOF OF DECEASED'S SHOOTING SCRAPES HELD PROPERLY EXCLUDED AS TOO BROAD.—In murder prosecution, defended on ground of self-defense, offer of proof of shooting scrape deceased had with somebody some ten years before homicide, in which defendant was in nowise concerned, and of another such affair, differing from first only in matter of time, *held* properly excluded as being too broad.

5. CRIMINAL LAW — HOMICIDE — INSTRUCTION ON, AND SUBMITTING FORM OF VERDICT FOR, MANSLAUGHTER HELD PROPER UNDER EVI-

1. Admissibility of evidence of character or reputation of deceased in prosecution for homicide, see notes in 124 Am. St. Rep. 1018; 4 Ann. Cas. 338; 8 Ann. Cas. 357; 11 Ann. Cas. 229. See, also, 13 R. C. L. 916.

2. Admissibility of evidence of turbulent and dangerous character of victim of homicide on issue of self-defense, see note in L. R. A. 1916A, 1245. See, also, 13 R. C. L. 919. 5. See 13 R. C. L. 936.

DENCE.—In murder prosecution, court did not err in instructing on offense of manslaughter and submitting verdict therefor under the evidence.

See (1) 30 **C. J.**, p. 229. (2) 30 **C. J.**, p. 234. (3) 30 **C. J.**, p. 229. (4) 30 **C. J.**, p. 234. (5) 16 **C. J.**, p. 1027; 30 **C. J.**, p. 406.

APPEAL from a judgment of the Superior Court of the County of Pima. George R. Darnell, Judge. Affirmed

Messrs. Richey & Richey, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. A. R. Lynch, Mr. Earl Anderson, and Mr. E. W. McFarland, Assistant Attorneys General, for the State.

ROSS, J.—The appellant, to whom we shall refer as defendant, was indicted and tried in Pima county for the murder of one José Amarillas, and was convicted of manslaughter. He defended on the ground of self-defense and also claimed the killing was accidental.

The defendant testified as a witness in his own behalf. After stating that the deceased's general reputation was that of a dangerous, turbulent, and violent man, he offered to testify that at the time of the homicide he had been informed of two shooting scrapes that happened in Pima county, or in that part of the state, in which deceased had been involved, one ten years before and one fourteen or fifteen months before, for the purpose of laying a foundation for the introduction of specific instances of aggressiveness of deceased. He also offered testimony of an eye-witness to each of such shooting scrapes to prove that deceased was the aggressor, claiming that such offered "testimony was admissible for the purpose of enabling and assisting the jury

to more readily determine who was the probable aggressor.''

The trial court sustained an objection to these offers and the ruling is assigned as error. This presents a very interesting question. It has not been passed upon by our court, and the courts that have considered it have not formulated any definite rule as a guide for the admission or exclusion of such evidence.

When one who has committed a homicide undertakes to justify his act, his state of mind at the time of the killing becomes an important issue. It may turn out that he was in no actual danger, still if he knows either from reputation or by personal contact that the deceased is a dangerous, turbulent person, the jury should be permitted to view any demonstration or overt act of the deceased in the light of such knowledge that they might judge his conduct accordingly. It is the rule that where it is questionable as to which was the aggressor, or where the state of mind of defendant at the time of the affray is in issue under the claim of justification, that the general reputation of the deceased as a dangerous, turbulent, and violent man may always be shown. *Campbell* v. *Territory*, 14 Ariz. 109, 125 Pac. 717; 1 Wigmore, § 246. Such evidence, however, is not competent unless and until it appears that the deceased may have been the aggressor or may have made some threatening demonstration to take the life of, or inflict upon the defendant great bodily harm.

It is when specific instances of violence and turbulence by deceased with third persons, that have occurred some time before the homicide, are offered to prove deceased's character or defendant's state of mind that the courts disagree. The trend of the decisions formerly was against ever permitting such evidence, and the principal reason assigned was that

if other particular instances be allowed to be shown
it "would lead to the mischief of raising any num-
ber of collateral issues, the trial of which might
be almost interminable, and otherwise objection-
able, as diverting the mind of the jury from the main
issue." Another reason given for rejecting such
testimony was that no person could anticipate the
many assaults that might be made on his character
and be prepared to meet them. *Heffington* v. *State,*
41 Tex. Cr. 315, 54 S. W. 755.

Thus, such testimony by these decisions is re-
jected for practical reasons and not because of its
invalidity to show who was the aggressor or the
state of mind of defendant at the time of the affray.
The trend, however, of the more recent decisions
appears to be in the direction of allowing to go be-
fore the jury evidence of particular acts of violence
and turbulence by the deceased towards third per-
sons, when such acts may legitimately and reason-
ably be of aid to the jury in determining whether
defendant's claim of self-defense was *bona fide* and
rooted in an honest belief of impending danger at
the time he acted.

In *State* v. *Ardoin,* 28 N. M. 641, 216 Pac. 1048,
Mr. Justice BOTTS, in a closely and well-reasoned
opinion, in which he reviews some of the leading
cases and cites others, deduces the following doc-
trine:

"From what we have already said, it would seem
that no inflexible rule of exclusion can be formulated
by which to test in all cases the admissibility of
such acts against third persons. Should the state-
ment of a general rule be attempted, we would surely
find ourselves embarrassed in its application to sub-
sequent cases where the facts are different from
those in the case at bar. It strikes us that the true
guide should be a reasonable discretion, and when-
ever the specific act, by reason of its character, or
its relationship in time, place, or circumstance to

the other facts in the case, would legitimately and reasonably either affect the defendant's apprehensions or throw light on the question of aggression, or upon the conduct or motives of the parties at the time of the affray, it should be admitted. It is true collateral issues may thereby be presented, but so may they be presented by the admission of other evidence as to which there is no question of its admissibility, although this feature might, and no doubt would, be taken into consideration by the court in exercising the discretion necessary to determine the admissibility of this class of evidence in any particular case: Wig. on Ev., § 248, and *State* v. *Hanlon,* 38 Mont. 557, 100 Pac. 1035.''

Neither the ends of justice nor a practical administration of the law requires or justifies the laying down of the bars to the admission of evidence of all the acts of violence of the deceased nor the arbitrary rejection of all such evidence. Each case must of necessity be largely determined upon its own facts. We think, where the facts show a *prima facie* case of self-defense, the accused should generally be permitted to introduce evidence of specific acts of violence by the deceased towards third persons within his own knowledge or coming under his own observation, as also that he knew or had been informed that deceased was a turbulent and quarrelsome man. We also deduce from the cases that previous acts of violence by the deceased towards third persons, when bearing some relation to or growing out of the same transaction as the one in which the homicide occurs, should be admitted in evidence for the purpose of helping the jury to determine whether a defendant acted in good faith and under an apprehension of losing his life or suffering great bodily harm.

We think an analysis of the cases upon this question well sustains the first proposition. *People* v. *Farrell,* 137 Mich. 127, 100 N. W. 264; *Mortimer* v.

*State,* 24 Wyo. 452, 61 Pac. 766; Wharton's Crim. Ev., § 84; Bishop's New Crim. Proc. (2d ed.), vol. 3, § 610.

The principle in the second proposition is recognized in the Hanlon case, *supra* (38 Mont. 557, 100 Pac. 1035), where particular acts of turbulence and violence by the deceased towards others, occurring shortly before and more or less related to and growing out of the same business relations and transactions, were permitted to be proved for the purpose of characterizing and explaining the conduct of the deceased at the instant defendant shot him, it appearing from defendant's testimony that deceased had hit defendant over the head with a club and also had "made a dart into his pocket for a gun." That court, after stating that some courts exclude such evidence entirely, for the reasons we have heretofore suggested, and others limit it to particular acts connected with or observed by defendant, states its conclusions as follows:

"But no hard-and-fast rule of exclusion may be laid down. A wise discretion should be the guide, and in all cases where the specific act, by reason of its proximity in time and place, would legitimately reflect upon the conduct or motives of the parties at the time of the affray, and especially when, as in this case, it bears some relation to the main fact, the homicide, it should be admitted. 1 Wigmore on Evidence, § 248. It is within the purview of this limitation that we hold the evidence offered in this case to be admissible."

*Mortimer* v. *State, supra,* was a case wherein one of the deceased's children shot and killed his father, who at the time was apparently carrying out a threat to kill another of his children by choking him to death. Evidence offered by the accused of previous known assaults by his father upon himself, his mother, and his sister was rejected by the trial court. Its exclusion on appeal was held to be error.

It was also held to be error to reject evidence offered to show an assault by the deceased upon his wife when visiting at another ranch, and, on her return home, immediately communicated to the defendant and his brother in explaining what caused her eyes to be blackened and swollen; as also an assault upon his wife on the morning of the homicide. Other cases to the same effect are *Bailey* v. *People,* 54 Colo. 337, Ann. Cas. 1914C, 1142, 45 L. R. A. (N. S.) 145, 130 Pac. 832; *Bowlus* v. *State,* 130 Ind. 227, 28 N. E. 1115; *Wallace* v. *State,* 44 Tex. Cr. 301, 100 Am. St. Rep. 855, 70 S. W. 756.

We believe that the defendant asked the court to go too far in his offers in this case. The first offer is of a shooting scrape the deceased had with somebody some ten years before, in which the defendant was in nowise concerned. The second is different from the first only in the matter of time, it having occurred fourteen or fifteen months before. Perhaps the fact of these exhibitions of violence and turbulence, if known to defendant, might properly have been allowed to go before the jury, but the proposition as contained in the offer was to ''lay the foundation for the introduction of specific instances of aggressiveness of the deceased by the testimony of witnesses. . . . ''

We think the statement of the rule by the court in *People* v. *Farrell, supra,* not only just to the defendant but the most practical in the administration of the law:

''When a person is charged with murder for killing an assailant, he may show, for the purpose of proving that he believed his life in imminent peril, that deceased was a man of high temper and quarrelsome disposition, and known by him to be such. See *Hurd* v. *People,* 25 Mich., at page 418; *Brownell* v. *People,* 38 Mich. 732. He may also, for the same purpose, show specific acts of violence within his own knowledge or coming under his own observa-

tion. See *People* v. *Harris,* 95 Mich. 87, 54 N. W. 648. But it is well settled that it is not admissible to show specific acts of violence committed by deceased upon third persons, in no wise connected with nor observed by the defendant, on the ground that such matter is too remote, and, if proof were admitted, so, also, would repelling evidence, and the side issues thus raised would be as numerous as the offenses imputed to the deceased. See *Alexander* v. *Commonwealth,* 105 Pa. 1; *Dupree* v. *State,* 33 Ala. 380, 73 Am. Dec. 422; *McKenna* v. *People,* 18 Hun (N. Y.), 580; *Fitzhugh* v. *State,* 81 Tenn. 258; *State* v. *Elkins,* 63 Mo. 165; and *Thomas* v. *People,* 67 N. Y. 218. In *People* v. *Dowd,* 127 Mich. at page 143, 86 N. W. 546, the above principle was approved by this court. An examination of the record shows that the excluded testimony in that case, as in the case at bar, was accompanied by a proposition to prove that respondent had heard of the specific act of violence under consideration. If the excluded testimony had related merely to what respondent had heard of the occurrence in question, we should hesitate to say that it was not admissible. See *People* v. *Harris, supra; Boyle* v. *State,* 105 Ind. 469, 5 N. E. 203, 55 Am. Rep. 218. But the excluded testimony related, not to the information respecting the occurrence which had reached respondent; it related to the specific act of violence itself, and, under the authority of *People* v. *Dowd, supra,* it was properly excluded."

We conclude there was no error in the court's ruling on the offer of evidence for the reason that it was too broad, and, for the further reason, it does not appear that the court's discretion in the matter was in any way abused.

Defendant complains that the court erred in instructing the jury on the offense of manslaughter and in submitting to the jury a form of verdict for manslaughter. He contends that the testimony of Contreras, the only eye-witness for the state, showed, if the jury believed him, that the offense was murder

in the first degree; while the testimony of the defendant, if the jury believed him, showed that the homicide was justifiable; that there was no middle ground, no manslaughter, and that it was error to submit an instruction thereon, and to give to the jury a form of verdict for manslaughter. This assignment brings us to the facts of the case.

The deceased and defendant lived not very far apart in that section of Pima county known as the Rincon Mountains. The killing took place on January 17, 1923, at the defendant's ranch-house. It appears that on Sunday, the 14th of January, there was some horse-racing just outside of Tucson at which both of these parties were present. According to defendant's testimony, because he refused to bet on the races, the deceased used very foul and insulting language to him, threatened to strike him with his lariat and run over him with his horse. Defendant states that he remained at the races for the first race only. During that day, and before he went back to his ranch in the Rincons, he went to the home of a Mr. M. L. Tophoy and gave to him a written notice requesting him to send somebody to the defendant's ranch to get a steer that belonged to Tophoy that had been there for something like four years. Mr. Tophoy wrote on the back of this notice a note to the deceased, an employee, to go after the steer. Defendant took this note and by one of his children sent it to deceased. On the morning of January 17th, three days later, the deceased and one Francisco Contreras went on horseback to the ranch-house of defendant to get the steer, arriving there about 10 o'clock in the morning. There was no one at the ranch except defendant. After friendly greetings defendant asked deceased if he had come for the steer and when answered in the affirmative said, "he is thereabouts." The deceased was unarmed. To this point all the

testimony is in accord. Contreras testified defendant then went into his house and came out with a six-shooter and fired at the deceased; that the deceased got off his horse and sought shelter in a small outhouse, some fifteen or twenty feet from the ranch-house; that defendant followed him into the house and deceased came out; that just outside the door defendant shot him, that there were five shots in all, two taking effect, one in the foot and the other in the breast of deceased. Contreras had a gun but did not get off his horse or take any part in the trouble.

The only other eye-witness was the defendant, and his statement of how the trouble arose, and the part he took therein, is about as follows: He was in his house when attracted by the barking of his dog, and going outside he met the deceased and Contreras who came up about that time or just after. When he asked deceased if he had come for the steer the latter answered by getting off his horse, at the same time calling him vulgar and abusive names; that deceased struck him with his hands or fists and continued hitting him until defendant ran into his house; that he hit him four or five times with his hands; that deceased followed defendant into the kitchen and stopped there; that defendant passed through the kitchen into the bedroom, closing the door behind him, and got his pistol from under his pillow; that he then went out through another door and when he got back out into the yard he found the deceased out there; that the deceased came toward him immediately; that he said to the deceased:

"Get away from me. I don't want to fight. If you get closer to me I will shoot at you. I don't want to fight you. Finally I shot him, shot at his feet. I don't know if I hit him or not. I shot at him so that he would get away from me. But he didn't withdraw or retire. He came on at me more

so until he grabbed hold of me as I was tired, until we commenced to wrestle, and we went up to the place where the shot went off accidentally. He killed himself. That was all that happened.''

Defendant testified that he was afraid of deceased and that, when deceased got hold of his gun, which we conclude he did after the first shot, he was apprehensive that the deceased was going to do him great bodily injury; that he had very poor eyesight; that one of his eyes was dead; that he had suffered injuries from accidents to his shoulder, collar-bone, chest and knee in his work as a cowman, but there was no showing that by reason thereof he was not well able to defend himself. The evidence does not show any disparagement as to size, age or physical strength, although it is insinuated that deceased was a younger man than the defendant. Defendant testified that the deceased was in the habit of carrying a gun everywhere he went.

If the homicide happened as Contreras relates, it was a very unprovoked and uncalled for affair, and the instructions and form of verdict should have been confined to murder, and upon that theory it was error to instruct the jury on manslaughter, but error of which defendant ought not to be heard to complain because it was in his favor. If the homicide occurred as defendant relates, the jury might have concluded there was no showing of an actual or apparent necessity justifying the defendant's resort to the extreme measure of taking deceased's life in order to save his own or protect himself against serious bodily harm. Deceased was not armed and used only his hands or fists to strike defendant. Defendant was not even knocked down. He went into his bedroom and got away from deceased, the latter returning to the outside from the kitchen. He armed himself and voluntarily left his bedroom and went

out where the deceased was, knowing or expecting the trouble would be renewed. The jury might very reasonably have concluded that defendant did not act from necessity but from a feeling of revenge for the insult of the previous Sunday at the races and the assault and battery of a moment before, when defendant was unarmed. The issue as to whether defendant was guilty of murder or manslaughter was submitted upon instructions in correct legal form and upon a state of facts to which they were applicable.

The judgment is affirmed.

McALISTER, C. J., and LYMAN, J., concur.