James **HARTLEY**, Plaintiff-Appellant,

v.

Kenneth E. **OIDTMAN**, Defendant-Respondent.

No. 32421.

St. Louis Court of Appeals.

Missouri.

Nov. 15, 1966.

Motions for Rehearing or to Transfer to Supreme Court or to Modify Denied Dec. 12, 1966.

Application to Transfer Denied Feb. 13, 1967.

John O. Bond, Jefferson City, for plaintiff-appellant.

Hendren & Andrae, Henry Andrae, John E. Burruss, Jr., Jefferson City, for defendant-respondent.

ANDERSON, Judge.

■ This is an action to recover $15,000 actual damages and $10,000 punitive damages for an alleged assault on plaintiff, the trial of which resulted in a jury verdict in favor of defendant. Plaintiff has appealed. In his argument, plaintiff's counsel told the jury, "I would say in all that this young man has suffered actual damages of $5,000." Plaintiff having adopted a trial theory that he was only entitled to $5,000 actual damages and $10,000 punitive damages, the jurisdiction of this appeal is in this court. Beasley v. Athens, 365 Mo. 158, 277 S.W.2d 538.

Plaintiff presents four points for our consideration. Three of the points are based on the contention that defendant's evidence conclusively shows that defendant

was the aggressor in that he first assaulted plaintiff, and for that reason the trial court erred in overruling plaintiff's motion to direct a verdict for plaintiff on the issue of liability; in giving Instruction No. 7, which submitted self-defense; and in giving Instruction No. 2, which was on the burden of proof. In his other point, plaintiff presents the contention that the trial court erred in admitting evidence of other altercations between plaintiff and others which was not connected with the occurrence in question.

Defendant was the owner and operator of a tavern known as the Sunset Lake Lounge in or near Jefferson City, Missouri. At the time of the incident in question his age was twenty-two years. On the evening of February 9, 1963, plaintiff, twenty-two years of age, was a participant in a basketball game. After the game, plaintiff and his girl friend, who at the time of the trial was plaintiff's wife, together with Jack Casteel and his girl friend and Don Roark went to defendant's tavern, arriving there at approximately 10:30 P.M. At the time of their arrival, there were a number of patrons present. Among them was a group of high school seniors. In this group, among others, were Jerry Tellman, his girl friend Martha Preuss, Tom Debruck, and a brother of defendant. The tavern was equipped with facilities for a shuffleboard game and plaintiff and Debruck engaged in a game. It seems there was an understanding between them that the loser of the game would buy a pitcher of beer or pay the winner $1.00 in cash. After playing for some time, plaintiff and Debruck had an argument about the payment of the $1.00. Witnesses said that loud and vile language was used by the two participants which could be heard by all of the patrons in the tavern. Defendant, who was the bartender that evening, tried to stop the argument, and when he learned it concerned the payment of $1.00, he got a one dollar bill out of his cash register and offered it to plaintiff. Plaintiff refused to take the money saying, " * * * we want De-

bruck's dollar." It seems that the quarrel subsided for a short period of time but thereafter began again. Defendant returned to the participants in the argument and on this occasion he carried a blackjack in his hand. According to plaintiff's testimony, he pounded the blackjack on the bar, at the same time using vile language, and told plaintiff that if he did not get out of the tavern he would hit him in the head with the blackjack. Defendant did not remember beating the blackjack on the bar but admitted having it in his possession. He denied threatening to hit plaintiff over the head with it. He said he told plaintiff, "Either you're going to have to leave or I'm going to have to call the police." Plaintiff told him that he and his group would leave. One of plaintiff's own witnesses said that defendant did not pound the blackjack on the bar and a witness for the defendant said that defendant did ask plaintiff to leave and said that if he did not he (defendant) was going to call the police. Thereafter, plaintiff and his group left the tavern and defendant followed them. However, before following plaintiff and his group to the outside of the tavern, defendant hung the blackjack behind the bar. When plaintiff and defendant were outside, defendant put his arm around plaintiff's shoulder and said, " 'Jim, we have been friends for a long time, let's not have any hard feelings.' " Plaintiff said, " 'No, everything is all right.' " Plaintiff then asked defendant if he could go back into the tavern and use the toilet. Defendant gave his consent. Plaintiff then re-entered the tavern for that purpose.

The testimony further shows that in order to get to the toilet it was necessary to go through a large archway between the tavern and a room adjacent to it, the toilet being somewhere beyond this other room. Plaintiff, after entering the tavern through the front door, headed for the archway. To reach this objective, it was necessary for him to pass the other group of young people, heretofore mentioned, who were in the vicinity of the archway preparing to

leave the premises. According to plaintiff's testimony, Martha Preuss "said a few words to me and I just told her right back * * * and she slapped me right here on the face and I pushed her back like this. I didn't knock her down or anything, just pushed her back and that's when her boyfriend came at me and I swung and hit him in the eye." Plaintiff then walked through the archway to the men's toilet. .

Jerry Tellman was the person plaintiff struck. He was knocked down and was severely injured by the blow. He received a cut under the eye and was later taken to the hospital where the wound was sutured. According to defendant's evidence, Tellman did nothing to provoke the assault. Defendant testified that he entered the tavern after plaintiff returned to go to the toilet, and as he entered through the door, he saw plaintiff strike Tellman. He testified: " * * * Well, Martha Preuss was saying something. * * * And I never actually heard what Martha had said. * * * but the next thing I knew Jerry Tellman was walking up to Jim (plaintiff) and I never saw Jerry take a swing; I swear to God, I never saw that at all. And he had his arms down at his side and before I knew it Jim had hit him and he cut this part of his eye. The only thing I saw was the white of his eye. I thought he might have hit him hard enough to put it out. So I went and got a wet bar rag. * * * Q. You say Tellman was walking toward him and he had his arms down? A. That's the only way I can remember it, walking with his hands at his side. I cannot remember him making a pass at all." Tellman was not a witness in the case. He was killed in an automobile accident prior to the date of the trial.

Joan Lee Gerlach, a witness for defendant, testified she was in the tavern with Martha Preuss. She stated that prior to being struck, Tellman was "just standing there;" that he did not have his hands up, threatening; and that she was standing next to him. "Q. And then what happened? A. Jim Hartley hit him and he cut

his eye open right underneath here and it looked awful. Q. Did Hartley have anything offered toward him in the way of any threats at all by Tellman? A. No. Q. You mean he just hauled off and hit Tellman? A. Yes, he did * * * I was standing right next to Jerry when he hit him and he fell. He fell flat on his back and we didn't know whether he was hurt—. Q. Did he give him any warning that he was going to hit him in the eye? A. No, sir. Q. I'm talking about plaintiff, here. A. No, he didn't do anything, he just hauled off and slugged him one in the eye."

Edward Goodin testified on behalf of defendant concerning the Tellman incident. He stated that prior to plaintiff striking Tellman, the latter and Martha Preuss were at a coat rack near the door putting on their coats when plaintiff and Miss Preuss got into an argument and Miss Preuss slapped plaintiff; that when this occurred, plaintiff stepped back, and Tellman moved beside Miss Preuss; that plaintiff then hit Tellman; that when Tellman moved toward Miss Preuss he did not threaten plaintiff in any way; that Tellman had been turned a little sideways getting coats and "just kind of turned around;" that he did not offer any violence, threats or force to plaintiff; that plaintiff gave Tellman no warning "that he was going to deck him." There was no testimony as to what was said either by Martha Preuss or plaintiff prior to plaintiff striking Tellman.

When defendant was asked what this incident did toward his attitude, he answered:

"A. Well, it kind of got your hair all up again. I mean you just got one thing all over with and you started all over again.

"Q. Did it upset you? A. Well, yes, sir, it would.

"Q. Did you have any knowledge as to any duty you may have had to protect

your customers as the proprietor of a tavern?

"A. Well, I wasn't going to let anybody else get hit. I knew that."

Before plaintiff returned from the toilet, defendant took up a position in the archway. He stood with his hands over the top of the door and slightly to the right hand side, leaving ample room, however, for plaintiff to pass between where he was standing and the door jamb. Plaintiff's wife, who was outside the tavern sensed trouble when she saw Tellman being taken out and ran back into the tavern. She saw defendant standing in the archway and asked him what was going on. According to her testimony, defendant grabbed her by the arm and said, "'Get out of here, you're going to get hurt.'" About that time, plaintiff approached the archway on his way back from the toilet. Defendant testified: "Well, he came out of there and he still looked like he was still a little bit mad anyway, and so I—I don't know, I kind of took a swing at him, more or less. I didn't want him getting next to me because I didn't want to get hit at all. And I didn't hit him. Or he blocked it. And so then he hit me and knocked me up against a table. And so I got up—more or less holding on to him, and then I hit him and he fell back, not too very far from that planter. And he fell back on his back and the first thing he did, he put his hands to his face and he said, 'Oh, my jaw.' And that's all he said."

Defendant further testified:

"Q. When you saw Hartley coming toward you from out of the restroom did you have any apprehension or fear that he might assault you?

"A. I thought if he had done it once he could do it again.

"Q. Was this why you struck him or struck at him?

"A. Struck at him, yes sir.

"Q. You wanted to ward him off?

"A. Yes, sir.

"Q. And he was coming toward you?

"A. * * * Yes, sir.

"Q. But there was room for him to go—

"A. Pass by."

Defendant further testified that nothing was said between them before the blows were struck. Afterwards while plaintiff was down, plaintiff said he had had enough. Defendant then helped plaintiff up and applied a wet towel to his face. Plaintiff then left the premises with the assistance of his friends.

On cross-examination, defendant testified that when he exhibited the blackjack on the occasion of the argument between plaintiff and Debruck, he was angry. When asked whether plaintiff, as he approached the archway door, was walking along naturally, replied, "Oh, I guess he was. Still kind of mad * * * I couldn't tell you if he was walking slow, fast or normally. I would say he was just on his way. My way." He stated he was standing in archway door because he did not want any more of his customers hit; that he already had one hit and sent to the hospital; that he never saw Tellman strike at plaintiff, but that when he saw Tellman the latter was talking to plaintiff with his hands down at his sides; that he struck at plaintiff to keep someone else from being hurt. He admitted that as plaintiff came through the archway, plaintiff asked, "'What's going on?'" and then he "swung at him." Two witnesses for defendant testified they saw Martha Preuss slap plaintiff; that Tellman did nothing and said nothing to plaintiff; and that plaintiff without warning struck Tellman.

It is plaintiff's contention on this appeal that the trial court erred in overruling his motion for a directed verdict on the issue of liability, and in giving and reading to the jury, defendant's self-defense instruction. In support of these assignments, it is urged

that defendant's own evidence shows he was the aggressor in the encounter, having first struck at plaintiff, without provocation, while angry and after lying in wait for plaintiff to return through the archway into the tavern. It is urged that plaintiff committed no overt act which indicated he was angry at defendant, or intended to assault defendant or any of his customers. As a further argument, plaintiff in his brief states that the evidence showed that the altercation between Martha Preuss and her escort had completely terminated; that defendant was angry and for that reason assaulted plaintiff. It seems to be plaintiff's contention that the testimony concerning his violent and disgraceful conduct that evening prior to his encounter with defendant at the archway should not be considered in determining whether defendant at the time he struck at plaintiff had reasonable grounds to believe he was in danger of receiving bodily harm or that other customers would likely be attacked.

Defendant takes the view that it was for the jury to determine from all the facts and circumstances, including plaintiff's previous turbulent behavior that evening, whether defendant was legally justified in his actions on the ground he acted in self-defense, and to protect his customers from probable bodily harm.

The rule of law to be applied to the fact in this case is stated in Restatement, Second, Torts Sec. 63, p. 98.

"(1) An actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to defend himself against unprivileged harmful or offensive contact or other bodily harm which he reasonably believes that another is about to inflict intentionally upon him.

"(2) Self-defense is privileged under the conditions stated in Subsection (1), although the actor correctly or reasonably believes that he can avoid the necessity of so defending himself.

"(a) by retreating or otherwise giving up a right or privilege, or

\*     \*     \*     \*     \*     \*"

In Section 76 of the same work, the rule applicable to the defense of third persons is stated as follows:

"The actor is privileged to defend a third person from a harmful or offensive contact or other invasion of his interests of personality under the same conditions and by the same means as those under and by which he is privileged to defend himself if the actor correctly or reasonably believes that

"(a) the circumstances are such as to give the third person a privilege of self-defense, and

"(b) his intervention is necessary for the protection of the third person."

In the reporter's notes to this section, after pointing out that while originally the right of defense of others was restricted to members of the actor's family or household, such narrow application under modern law has been abandoned. It is said:

"(e)  \*   \*   \*

"The restriction of the privilege to intervene on behalf of third persons to those who are members of the actor's family or household was founded upon conditions long since past. Such a restriction is inconsistent with the duties which the law imposes upon persons standing in many relations to others, which require them to protect such others from the invasion of their interests of personality. Obviously it is impossible that liability should be imposed as a penalty for doing that which there is a legal duty to do.

"(f) But even though there is no relation which imposes a legal duty to act for the protection of another, the restriction of the privilege to intervene for the protection of third persons, even from harm less than death or serious injury,

to members of the same family or household is opposed to the settled usages of modern society. The same policy which permits intervention to prevent a breach of the peace, stated in § 141, justifies one human being in the use of reasonable force to protect the safety of another, without regard to any relation between them; and in the ordinary case the two privileges are so merged that it is impossible to distinguish them. As stated in Salmond, Torts, (11th ed. 1953) 375, 'It may safely be assumed that at the present day all such distinctions are obsolete, and that every man has the right of defending any man by reasonable force against unlawful force.' "

Where a person has reasonable grounds to believe, and does believe that another is about to assault him, or do bodily harm to one to whom he owes a duty to protect, he need not wait until the other person actually strikes or makes an assault before resorting to the application of reasonable force to repel the expected attack. State v. Daugherty, Mo., 196 S.W.2d 627. And it has been held that where the person does not use a deadly weapon, fear of bodily harm only is sufficient to support a justification by self-defense in a civil action. See 6 Am.Jur. 2d, Assault and Battery, § 159, p. 134. It is also our belief that in considering the plea of self-defense, the time, place and surrounding circumstances must be considered together with the actor's knowledge of previous acts and the reputation of the person believed to be threatening bodily harm.

The evidence shows that plaintiff during his stay at the tavern and for some period of time that evening engaged in a violent argument with another customer, using vile and obscene language which could be heard by everyone in the tavern, including several teenage girls who were present. It could be found from the evidence that the argument was of such a nature as to lead one situated as was defendant to believe that physical violence was likely to occur

unless stopped. Defendant attempted to stop the argument by offering plaintiff the sum of money over which the argument raged, but said offer was refused. There was a lull in this disturbance for a short period of time but the argument was resumed and on account of its quarrelsome and vile nature, defendant was forced to order the disputants and the group with them out of the tavern. Plaintiff, thereafter, re-entered the tavern and immediately engaged in an argument with Martha Preuss. The record does not show what was said during the argument, but it does appear that Martha slapped plaintiff in the face. The slap was administered in retaliation for something said by plaintiff, which was, no doubt, of a vile and insulting nature. Plaintiff then gave Martha a violent shove, and when her escort, Tellman, turned to see what had occurred, plaintiff without provocation, knocked him down.

As a result of this blow, Tellman suffered a severe cut under the eye and had to be taken to a hospital where the wound was sutured. Defendant witnessed this episode as he was returning through the tavern door from the outside where he had previously gone in an attempt to pacify plaintiff. A few minutes later, plaintiff, returning from the toilet, approached the archway. He had an angry look on his face and came toward defendant although it was not necessary for him to do so, since defendant was not blocking the archway, but stood at one side leaving ample room for plaintiff to pass between defendant and the door jamb. Defendant, in effect, testified he was at that time apprehensive and in fear that plaintiff might assault him, his testimony being that he swung at plaintiff because he did not want plaintiff to get next to him—that he did not want to get hurt. He also stated he was standing in the archway at the time because he did not want any more of his customers hit. A finding that defendant was in fear for the safety of his customers is fortified by the fact that he told Linda Cartwell, who had returned to the

tavern from the outside, to "get out of here, you're going to get hurt." It also appears that plaintiff had a turbulent disposition, and had engaged in previous fights of which defendant was aware. From this evidence and the testimony of the violence exhibited by plaintiff just prior to the alleged assault and the manner of his approach toward defendant who stood in the archway, a jury would be justified in believing that on the occasion in question plaintiff ran amuck, and exhibited such violence as would put a person situated as defendant was, in reasonable fear for his safety and that of his customers. This exhibition of violence which plaintiff apparently enjoyed ceased only after he was knocked to the floor after striking defendant, as evidenced by his remark that he had had enough.

■ It is true that in this case different inferences concerning the ultimate fact issues could be drawn from the testimony introduced at the trial. This made the determination of those facts a question for the jury. We would be usurping the province of the jury were we to hold otherwise, and rule that as a matter of law plaintiff was entitled to a directed verdict on the issue of liability, or that the court erred in submitting the issue of self-defense.

The court of its own initiative gave Instruction No. 2 which was a burden of proof instruction, being MAI No. 3.01:

"In these instructions you are told that your verdict depends on whether or not you believe certain propositions submitted to you. In determining whether or not you believe any proposition, you must consider only the evidence and the reasonable inferences derived from the evidence. The burden is upon plaintiff to cause you to believe the propositions necessary to support his claim against defendant. If the evidence in the case does not cause you to believe a particular proposition submitted or if you are unable to form a belief as to any such proposition, then you cannot return a verdict requiring belief of that proposition."

■ Appellant's first complaint against this instruction is that it is erroneous for the reason that it places on plaintiff the burden of proving that defendant assaulted him, when defendant by his own testimony admitted he was the aggressor and first assaulted plaintiff. There is no merit to this contention. Defendant did not admit that he was the aggressor and assaulted plaintiff without provocation. His testimony tends to show that he acted in self-defense, which we have heretofore held was substantial evidence and sufficient to authorize the submission of said issue to the jury.

Plaintiff, at the trial, made no objection, either general or specific, to the giving of Instruction No. 2. However, in his motion for new trial, plaintiff complained that the instruction was erroneous because it did not charge the jury that the burden of proof on the issue of self-defense was on the defendant. On this appeal this same objection is urged.

Defendant takes the position that the instruction was not erroneous because it did not specifically place the burden of disproving the propositions necessary to support said affirmative defense, but merely placed the burden on plaintiff of proving the propositions submitted in his verdict directing instruction. Plaintiff's verdict directing instruction was the approved MAI No. 23.02 and was as follows:

"Your verdict must be for plaintiff if you believe:

"First, defendant intentionally struck plaintiff, and

"Second, defendant thereby caused plaintiff bodily harm unless you believe that plaintiff is not entitled to recover by reason of Instruction No. 7."

■ Instruction No. 7 was the approved form, MAI No. 28.07 for submission of the issue of self-defense in an assault case. It contained no reference to the burden of proof on said issue. In reading Instruction No. 4 and Instruction No. 7, it

appears that one of the elements necessary for plaintiff to recover was a belief that defendant was not acting in self-defense. Instruction No. 2 charged the jury that " * * * The burden is upon plaintiff to cause you to believe the propositions necessary to support his claim against defendant. * * * " Therefore, in logic, it would seem that by said instruction, the court charged the jury that the burden of proving that defendant did not act in self-defense rested on plaintiff. This was error. The plea of self-defense in a civil action for damages for an assault is an affirmative defense, and the burden of proof of such defense rests upon the person asserting it. Such direction should have been contained in Instruction No. 2. This is recognized by the committee that drafted the instruction, for in a note with reference to its use, it is stated that if a defendant submits an affirmative defense the instruction should be altered to fit the situation; giving as an example a case where contributory negligence is submitted as a defense. It also states that the instruction must be given in every case. (See Vernon's Missouri Approved Instructions)

█ But defendant says that plaintiff cannot complain because he had the opportunity and the duty to request such an amendment before the case was submitted to the jury. If we should sustain such contention and rule that plaintiff was under a duty to object to the instruction on the ground that the matter of self-defense was not included therein, we would run counter to Civil Rule 70.02, V.A.M.R., which reads:

"Counsel need not object to any instructions to be given at the request of any other party or by the court on its own motion or to the refusal of any instruction requested by such party. Specific objections to instructions shall be required in motions for new trial unless made at trial. The making of objections during trial shall not preclude making additional objections to the same or other

instructions in the motion for a new trial."

This rule was in effect at the time this case was tried. We find no merit to the point urged. The court erred in giving Instruction No. 2 for the reason it did not properly cover all the issues in the case.

Finally it is urged that the trial court erred in permitting defendant to show, by cross-examination of plaintiff, and by testimony of other witnesses, that plaintiff had two other altercations at the tavern. It was shown that on one occasion, an argument ensued between plaintiff and a highway patrolman where plaintiff, according to his testimony, was merely trying to stop a fight between two others. No blows were struck on this occasion. Defendant subsequently learned of this encounter. The other incident occurred inside the tavern when plaintiff and his companion violently and without warning attacked another customer as he was leaving the tavern. Defendant witnessed this incident. Both incidents occurred shortly before the one here in question.

Plaintiff contends that the foregoing evidence was not admissible for any purpose; that plaintiff's turbulent disposition in an assault case may be shown by proof of general reputation, but not by evidence of specific acts of violence.

█ There can be no doubt that the evidence complained of was relevant to show defendant's state of mind; that he had reasonable grounds to apprehend danger to his person and the safety of his customers. State v. Creighton, 330 Mo. 1176, 52 S.W. 2d 556; State v. Goode, 271 Mo. 43, 195 S.W. 1006. The evidence could be excluded only upon principles of policy, particularly those of Confusion of Issues, Unfair Surprise, or Undue Prejudice. And whether such principles should be applied rests within the sound discretion of the trial court. See State v. Wilson, 250 Mo. 323, 157 S.W. 313; Mortimore v. State, 24 Wyo. 452, 161 P. 766; Mendez v. State, 27 Ariz. 82, 229 P.

1032. We have examined the record with reference to this matter and have reached the conclusion that there was no abuse of discretion in the admission of the testimony of these previous acts of violence.

The judgment is reversed and the cause is remanded for new trial.

WOLFE, P. J., concurs.

RUDDY, J., dissents in separate opinion.

RUDDY, Judge (dissenting).

I respectfully dissent from the majority opinion because I believe plaintiff is correct in his contention that there was no evidence to support the submission of self defense. Plaintiff contends that the evidence showed that defendant was the aggressor and struck the first blow and that plaintiff had committed no overt act when defendant, lying and waiting, struck at him and injured plaintiff. Plaintiff contends that defendant's own evidence shows conclusively that he was the aggressor and that there was no evidence in plaintiff's case to support defendant's self defense instruction. After a close analysis of the evidence in the case as shown in the majority opinion and other record evidence which I shall refer to, I must agree with plaintiff's contention.

I do not disagree with the principles of law relied on in the majority opinion. My disagreement is with the application of the law to the facts of this case. The rule to be applied as given to us in the Missouri cases is that found in Duncan v. Moore, 219 Mo. App. 374, 271 S.W. 847, l.c. 849, where the court said (quoting from 2 R.C.L. 549, § 27):

"An assault and battery cannot be justified on the ground of self-defense unless the person assaulted had at least done some overt act or made a hostile demonstration of a character to give the assailant reasonable ground to suppose himself in imminent danger."

The overt act or hostile display of force must be under such circumstances as to cause defendant reasonably to suspect and fear injury and must be reasonably calculated to create apprehension of *present violence*. Any movement, however threatening, which does not produce such fear of physical harm will not justify an assault. 6 C.J.S. Assault and Battery § 5c(1), p. 799. From what I have said it will be noted that it is essential, in order to justify a submission of self defense, that defendant's proof show that there was an overt act of attack and that defendant at the time had reasonable grounds to suppose that he was in imminent danger. There must be evidence that defendant had just cause to believe that plaintiff was about to assault him in order to justify defendant's act in first striking plaintiff. What I have said finds support, either directly or inferentially, in the following cases: Cunningham v. Reagan, Mo., 273 S.W.2d 174; Lehman v. Lambert, 329 Mo. 1147, 49 S.W.2d 65, 67; Lawrence v. Womack, Mo.App., 23 S.W.2d 190. In all of the cases cited by the parties, which I have examined, where the principle of self defense is discussed, it is clearly shown that the person assaulted must be found to be doing something which will reasonably cause and does cause the other party to believe that an assault is about to be committed upon his person and in order to repel that assault he strikes the first blow.

In order for defendant to avail himself of the right of self defense it is also essential for him to show that his fear of physical injury be reasonable or such as a reasonable person would entertain under the circumstances at the time of the assault. However, the mere belief of a person using force to repel an assault is not alone sufficient to make it a case of self defense, unless the facts justify such belief. 6 C.J.S. Assault and Battery § 18b(1), p. 811; and Lehman v. Lambert, supra. It is evident to me upon a perusal of the evidence in this case that plaintiff did not commit any overt act at the time defendant swung on plain-

tiff or prior thereto which should have reasonably caused defendant to fear an injury to his person; nor did plaintiff make any hostile demonstration toward defendant at any time of a character to give the defendant reasonable grounds to suppose that he was in imminent danger. I find no evidence from which the jury could find that plaintiff was about to attack defendant and as said in Lawrence v. Womack, supra, 1. c. 192: " * * * One cannot attack without first being attacked. * * * "

Defendant's testimony shows that he took the first swing at plaintiff and it becomes clear as I read his testimony that at the time he swung at plaintiff he was under no apprehension or fear of physical harm to himself or to any of his customers at the hands of plaintiff. He waited for plaintiff at the archway where plaintiff had to pass through and when plaintiff's wife sought information as to what was going on defendant grabbed her by the arm and told her to get out of there, that she was going to get hurt. From this statement it may reasonably be inferred that he expected violence to occur and it may reasonably be inferred that he intended to initiate it. I do not agree with the majority opinion in the finding that defendant was in fear for the safety of his customers when he made this remark to Linda Cartwell, the girl friend of plaintiff and later to become his wife. Certainly defendant did not think at the time that plaintiff was about to injure his girl friend. I think the proper and reasonable inference that must be taken from this statement of defendant to Linda Cartwell is that defendant expected violence to occur and that he would start that violence. Defendant admitted that when plaintiff left the restroom he walked toward the archway "naturally," however, saying, that plaintiff looked like he was still " * * * a little bit mad anyway * * *." There is nothing in this description to show that plaintiff might have been mad at defendant and even if he was it would have been insufficient to support a plea of self defense. Duncan v. Moore, supra.

Defendant's own testimony reveals his reason for attacking plaintiff. It does not demonstrate or indicate that he had any fear of an attack by plaintiff on his person or on the person of any customer at that time. When he was asked what his attitude was toward plaintiff, after the incident between Tellman and plaintiff, he said, " * * * it kind of got your hair all up again." He admitted that the incident upset him and he was determined that plaintiff was not going to hit anybody else in the tavern. He admitted that he waited in the doorway or archway for plaintiff to come out of the restroom. This was a place where plaintiff had to come in very close proximity to defendant in order to pass through the archway. With his " * * * hair all up again * * * " he waited there for plaintiff with his hands up over the top of the archway. This was not the kind of conduct or attitude of a person about to be assaulted or who entertains fear of bodily injury to his person. Rather, it was an attitude of belligerence and of one who is about to do battle.

Defendant's testimony clearly indicates that he started the fisticuffs. When plaintiff left the restroom he had to come in the direction of the archway where defendant was standing in order to get through. Defendant admitted that plaintiff asked "What's going on?" and immediately thereafter he swung at plaintiff. This inquiry of plaintiff certainly was not an overt act or hostile demonstration on the part of plaintiff toward defendant and could not, under the circumstances, cause defendant to apprehend that plaintiff was about to inflict physical injury on his person or on any other person. When defendant was asked if he had any apprehension or fear that plaintiff might assault him, he answered, "I thought if he had done it once he could do it again." This was an evasive answer and did not indicate that he possessed any apprehension or fear that he might be assaulted by plaintiff. As we have pointed out heretofore, defendant's fear of injury at the hands of plaintiff

must have been a reasonable one or such as a reasonable person would entertain under the circumstances. Defendant's testimony shows no circumstances that would cause him to apprehend or to fear injury at the hands of plaintiff. I think the only reason shown by defendant's evidence, and for that matter by all the evidence in the record, for his assault on plaintiff, was summed up in his answer, when he said, that he "took a sock" at plaintiff to keep somebody else from being hurt. It may well be that the "Code of the street" would approve and tolerate such conduct on the part of defendant in view of the happenings and the conduct of the plaintiff that evening. But as said in Lehman v. Lambert, supra, 1. c. 67 (quoting from 2 R.C.L. 554): "* * * 'Peace and good order and the rules for civilized society forbid that individuals shall right their own wrongs. * * *'" Where one prepares himself for an encounter in which he intends to wreak his malice, he is not entitled to the plea of self defense. Lawrence v. Womack, supra, 1. c. 192.

Defendant's testimony clearly shows that he was the aggressor and struck the first blow and that he assaulted plaintiff without any legal justification or excuse. The evidence clearly shows that Tellman and his group had left the tavern and were gone at the time plaintiff came out of the restroom. There was no other customer present that plaintiff had threatened that evening; nor was there any customer present that was threatened at the time or about to be assaulted by plaintiff at the time.

The evidence shows that plaintiff had to be hospitalized and at some time following the described occurrence, defendant visited plaintiff's home to discuss the affair. He told plaintiff that we have been good friends and that he did not know why he had hit plaintiff. Defendant invited plaintiff to return to the tavern as a customer in his place of business. It is true that this evidence was given by plaintiff, but I think it sums up defendant's conduct on the evening in question—that he did not know why he hit plaintiff. Obviously, such a statement on the part of defendant excludes any apprehension of fear or of physical violence to defendant at the hand of plaintiff.

The majority opinion holds that the slap administered on plaintiff by Martha Preuss was no doubt in retaliation for vile and insulting remarks by plaintiff. There is not one bit of evidence in the record to show the nature of these remarks or what was said; nor is there anything in the record to show what Martha Preuss said to the plaintiff. All witnesses agree that Martha Preuss was the first to engage plaintiff in an argument. No mention is made in the majority opinion about defendant's aggressive and belligerent action in shoving and causing injury to Don Roark immediately following his encounter with the plaintiff. Don Roark, without having made any protest to the defendant or any threatening or hostile act, was shoved to the floor and injured by the defendant, immediately after his encounter with the plaintiff, which in my opinion is evidence of defendant's continued belligerent and aggressive conduct.

The majority opinion cites Restatement, Second, Torts Sec. 76 to the effect that where a person has reasonable grounds to believe, and does believe that another is about to assault or do bodily harm to one he owes a duty to protect, he need not wait until the other person actually strikes or makes an assault before resorting to the application of reasonable force to repel the expected attack. I would not quarrel with this statement of the law. I do contend that there is not one bit of evidence to show that anyone to whom defendant owed the duty to protect was about to be assaulted. The only previous assault of the evening perpetrated by plaintiff had been on the person of Tellman who at the time of the encounter forming the basis of this law suit had left the premises together with his associates. No other person had been attacked that evening nor was any other

person in the tavern threatened by plaintiff with physical violence. As said in 6 C.J.S. Assault and Battery § 19, p. 815: " * * * When the danger is over, justification for the use of violence is at an end." Therefore, this principle of law relied on in the majority opinion has no application to the instant case.

Turning attention to the contention of plaintiff that the court erred in admitting evidence of other altercations of plaintiff which were disassociated from the occurrence in question, I must agree that this was error. During the trial defendant sought to cross-examine plaintiff about prior specific acts wherein plaintiff had been engaged in altercations. Plaintiff objected to this cross-examination and in the colloquy that followed between the attorneys and the court, defendant's attorney informed the court that he proposed to bring in witnesses to show that plaintiff " * * * has picked fights with other persons * * *." Defendant sought this cross-examination and the right to make this proof on the ground that defendant had pleaded self defense and that in such a case proof of these acts and defendant's knowledge of the turbulent and violent disposition of the plaintiff were proper matters of evidence and said that the proof of specific acts was an exception to the rule that permitted only proof of reputation. The court sustained plaintiff's objection to the cross-examination and proof of the specific acts. Despite the court's ruling cross-examination regarding and proof supporting plaintiff's engagement in other altercations were permitted by the court and plaintiff, as stated, now says this constitutes prejudicial error. The rule, as I find it, is that such evidence, if not remote, is admissible in a proper case, but is not competent to sustain the plea of self defense, *unless proof is first given that there was an overt act of attack by the plaintiff or some threatening demonstration to inflict bodily harm on the defendant* by plaintiff and that defendant at the time had reasonable grounds to suppose that he was in imminent danger. Duncan v. Moore, supra, Mendez v. State, 27 Ariz. 82, 229 P. 1032. Inasmuch as I have found that there was no evidence to support defendant's plea of self defense this evidence of other altercations of plaintiff, not associated with the one in question, was inadmissible. Such a rule is sound and logical. Of course, if defendant's only evidence of self defense was proof of other altercations, obviously, no submissible case would be made for the jury. Therefore, these prior altercations are inadmissible until there is evidence of an overt act of attack by the plaintiff or some threatening demonstration to inflict bodily harm on defendant by plaintiff and that defendant at the time of the assault that forms the basis of the law suit had reasonable grounds to suppose that he (defendant) was in imminent danger. As I have said defendant's evidence and all other evidence in the case showed that defendant was the aggressor and assaulted plaintiff without any legal justification or excuse. Therefore, the trial court erred in admitting evidence of other altercations.

I would find that the trial court erred in failing to direct the jury to find the issue of liability in favor of the plaintiff and against defendant and the jury should have been instructed that the only question for it was the amount of damages sustained by plaintiff. I would reverse the judgment and remand the cause for a new trial on the issue of damages only.